Dallam v. Renshaw.

———•••••———

DALLAM, Appellant, v. RENSHAW, Respondent.*

1. Should the plaintiff in an execution, acting in concert with the defendant therein, purchase in the property of such defendant with a view to cover up the same from the latter's creditors, the transaction would be fraudulent and the other creditors may treat the execution sale and the sheriff's deed as nullities.

2. When all the facts bearing upon the question of the intent of such a transaction will as well consist with honesty as with dishonesty and fraud therein, the court ought not to find the same to be corrupt and fraudulent; the proof of fraud should be perfectly satisfactory.

*Appeal from St. Louis Circuit Court.*

*S. T. Glover* and *Dick,* for appellant.

*Todd & Krum,* for respondent.

NAPTON, Judge, delivered the opinion of the court.

This case presents mainly questions of fact, although a great many points in relation to the admission and rejection of testimony are also preserved. As all the testimony, whether rejected or admitted, is found in the record, an ex-

———

* The questions involved in this case are so purely questions of fact, and the evidence bearing thereon is so voluminous and complicated—the bill of exceptions containing more than seven hundred pages — that it has been deemed impossible adequately to set forth the facts in evidence, and it has not been attempted.—[REP.

amination and decision of these points becomes unnecessary in view of the conclusion we have reached upon the whole case.

The record is extremely voluminous, and the various transactions in proof during a series of years are complicated. To undertake a review of the details would fill a volume. It will perhaps answer all the purposes, which adjudications of this character can be expected to subserve, to announce the conclusion reached, and the prominent reasons which have lead to it. The plaintiff, a creditor of Charles Collins, obtained a judgment against him in 1848 for about eighteen hundred dollars, and levied his execution upon a lot in the city of St. Louis, known as the "Scott Hotel," and bought Collins' interest therein. This lot, together with some fifteen or twenty other lots or tracts of land in the neighborhood of St. Louis, had been sold under execution in 1840, and had been purchased by Stacker & Erwin, to whom Collins was at that time largely indebted. The exact amount of this indebtedness is disputed, but combining the individual indebtedness to Stacker with the judgments obtained by Woods, Stacker & Co., and Yeatman, Woods & Co., for which Erwin was agent, and the judgments of W. C. Anderson, which had been bought up, they may be stated at a sum not less than fifty thousand dollars. The plaintiff brought his action in 1852, and he insisted that the purchase of S. & E., under an execution in 1840, was fraudulent and void, and that all the subsequent transfers of this property through McConnell, Reyburn, Morrison, Bowman, and others, were made with a full knowledge of this fraud and a full participation in the original scheme; that they were designed to defraud Collins' creditors; and he insists that these deeds, which on their face are absolute, and purport to convey an absolute title, shall be held fraudulent and void, and so declared, and the title to the said Scott Hotel property be transferred to him by virtue of his purchase in 1848, under his execution. It will be thus perceived, that the sole question in the case is one of fact; and that is, whether the sale to Stacker & Erwin, in 1840,

was valid and *bona fide*, and vested the title, or was fraudulent and consequently void. If this sale is upheld and the title *passed at that time*, whatever character may be affixed to subsequent transactions, the present action must fail. If the sale in 1840 was valid, then Collins' interest in this property was gone, and his creditors could not be injured. Subsequent transactions with Collins might give him an equitable interest in this property such as would authorize a transfer of the title to Collins' creditors, but such transfer could not be claimed except upon the same terms that Collins himself or his heirs would have the right to demand it. But the theory of this suit is based entirely upon the total invalidity of the original execution sale, and the subsequent transfers of the property which occurred during the succeeding eight or ten years are produced, not as creating new trusts, but as establishing original and continuous fraud. It will be observed that in the whole course of this proceeding, which embraces a number of years, there is no transfer to or from Charles Collins. The title at no time was nominally in him after the sale to S. & E. in 1840. It is not therefore a case in which a deed from a debtor to a creditor is attacked for fraud. The case is one in which a sale under execution is made, and that sale, and the purchase at it, are asserted to be fraudulent and void. There is no other ground upon which the action can be sustained. If the purchase in 1840, under execution, was valid, Stacker & Erwin became the absolute owners of the property; and if, as absolute owners, they thought proper to give Collins an interest, contingent or fixed, of one-half or one-third, or any other amount, such a transaction is not a fraud upon Collins' creditors. Collins' interest might perhaps be reached by execution, but the purchasers would only buy his interest—nothing more. He could not claim that he purchased the interest of S. & E. as well as Collins. The principle may be illustrated by supposing that S. & E. had fifty thousand dollars' worth of property in St. Louis, independent of any acquisition from Collins, not conveyed to them by deed directly from Collins or purchased under execution against

his property, and, through motives of friendship or for any other motive, thought proper to give Collins an interest in this property, and to retain the title in their own name. Is this a fraud upon the creditors within the meaning of the common law or the statute of fraudulent conveyances? Can the creditors claim the whole property and destroy the title and interest of S. & E.? It is clear that Collins' creditors have not been injured by the transaction. So far from that, they have been benefitted, if they are permitted to reach the interest of their debtor. Yet this case does not at all differ from the case put where the same amount of property is purchased at sheriff's sale, and the purchase is valid and *bona fide*. The purchaser is dealing with his own property, and there is no principle of common law and no construction of the statute of frauds which prevents him from assisting the defendant in the execution, even to the extent of giving him an interest in the same property, by subjecting his interest as well as the interest of the debtor to the executions of other creditors. Very different would be the case if the property was conveyed to S. & E. by Collins for such purposes, or if the sale under execution was used to effect the same object. The sales and conveyances would then be fraudulent, and the creditor could treat them as nullities, as no obstacles to his execution, and the title of the purchaser under the execution would prevail.

In all these cases, however, the subsequent dealings of a creditor and debtor, after a purchase under execution of the whole property of the debtor, are watched with suspicion, and their character and the circumstances attending them may be resorted to for the purpose of giving tone to the original purchase. In this view the plaintiff has adduced in testimony an entire history of the conduct of the parties in relation to the property in dispute during a series of years, and the various transmutations of ownership which it passed through. In this view we have looked at this mass of testimony to be weighed as a whole in giving character to the original purchase, and not in reference to the independent

validity of each separate transaction. Viewing the transactions in this light, we have not been satisfied, from the evidence in the case, that a court would be justified in pronouncing the purchase of Stacker & Erwin fraudulent, and in transferring the title to the Scott House property to the plaintiff. We do not attach much importance to the unsigned agreement or memorandum of 1840, which was found among Collins' papers at his death. To do so, would subvert all the well established principles of evidence. It does not appear that the paper was ever seen, or that its existence was ever known by either S. or E.; and if it was, the fact that it remained unexecuted would show that they repudiated it. The only ground upon which the paper is supposed to have any value as testimony, is a supposed coincidence in its terms with events as they subsequently transpired. But the force of this argument is destroyed if the events can as well be reconciled with the integrity of S. & E. as they can with the imputed corrupt bargain. This paper at most shows that Collins was willing, and may have thought himself able, to effect the arrangement of his property which is there set out; it can not show, nor have any tendency to prove, that such an arrangement was actually contemplated by S. & E., much less that it was consummated.

The purchase of the Virginia Hotel property from Tiffin is supposed to be a strong corroboration of the fraudulent agreement and plan foreshadowed in the unsigned paper. But other instances are adduced of similar conduct on the part of Collins in reference to other persons besides Stacker; and they altogether rather show a peculiarity and a uniformity in the conduct of Collins than fix any complicity in the affair upon Stacker. There is no evidence to show that Stacker knew of this transfer, and he denies it.

The executed agreement of June 19, 1844, is relied on on as conclusive evidence of fraud, so far as the transaction itself is concerned, and very strong evidence to fix an original corrupt bargain in 1840. This agreement is considered the most prominent piece of evidence brought forward in the

whole of the plaintiff's case. We have therefore bestowed upon it much consideration.

This paper, it will be observed, was executed nearly four years after the purchase at the execution sale, and about four years before the sale to Morrison in 1848. At the date of its execution, the title to the property now in dipute, and all the property purchased at sheriff's sale by S. & E., had been transferred to McConnell, and by McConnell conveyed to Reyburn, in trust to secure the notes given to Stacker by McConnell and endorsed by Collins. It seems also from the paper itself and from the testimony of Mason, who drew it up, that considerable real and personal securities, supposed then to have value, had been placed in Stacker's hands in New York by Collins. The agreement relates to both classes of property, that bought at the sheriff's sale and then in the legal ownership of Reyburn, and the New York securities. These latter ultimately proved of no value, and it is conceded, or, if not conceded, the evidence shows that this agreement was abandoned almost as soon as made. It soon became apparent that Collins had no title to a large number of the lots referred to in this paper, and at all events the terms of the contract were never carried out by either party.

We do not wish to be understood as giving any opinion as to the legal effect of this instrument viewed as an independent transaction, and affecting at least a portion of the property covered by it. The question to be decided is not whether the agreement was valid in part or altogether. We are not called upon to say whether it could be enforced, or could ever have been enforced, or whether it would be treated as fraudulent and void as to creditors. The agreement is not sought to be enforced, nor is it sought to be avoided or set aside. It is used to throw light upon previous transactions, and give a character to what passed before and after its execution. In this respect it is important and entitled to weight. There are some provisions in it which, as far as we have been enabled to understand them, can not be sustained. These provisions do not, however, relate to the property now

Dallam v. Renshaw.

in dispute. At most, it can only be claimed that they show a willingness on the part of Stacker to be used as an instrument by Collins to protect a portion of Collins' property from his creditors—not the property now in dispute. We see the force of it in this point of view, and have not wished to detract from its importance. At the same time we look upon it as connected with a train of events during a series of years, and the circumstances under which the paper was made, and are not willing to let the whole case turn upon this isolated transaction. We are by no means satisfied with the explanations which have been given of it, and we think it susceptible of an interpretation very unfavorable to Stacker; but we think it would be attaching undue importance to this document to make it conclusive of a fraudulent purchase four years before it was executed. This agreement, moreover, whatever bearing it might have upon Stacker, ought not to affect Morrison, in whose heirs the title now is, unless he had a knowledge of it. The circuit court has, it is true, found that such notice existed, but we have not been able to see the evidence upon which this finding is based. Collins was no doubt the agent in inducing Morrison to purchase the Scott Hotel property, and he was, as the evidence shows, advised of Stacker's willingness, or perhaps of his written or oral agreement to let Collins have this property upon certain conditions, and he doubtless agreed with Collins to give him the same privilege of redemption which he enjoyed from Stacker. But it does not appear that Collins exhibited to him the paper executed in 1845. It does not appear that Morrison ever saw or heard of this paper. So far as it related to the lot he was in treaty for, the agreement of 1844 did not show any thing fraudulent on the part of Stacker. It was a mere agreement to let Collins have this lot at any time within five years upon his paying an agreed sum, which sum, added to the price fixed upon the other lots selected, made the exact amount of the debt as settled between them. There was nothing fraudulent in this, and as the agreement was abandoned—was no longer subsisting—it is reasonable to infer

that it was never shown to Morrison. The latter evidently, although purchasing at Collins' suggestion, relied altogether upon Stacker—considered himself as buying from Stacker, and from him alone. He did not regard Collins as having any claim upon the property. He was seeking a profitable investment of money, and he sought to make and supposed he was making that investment safe as well as profitable. His agreement to let Collins have the property upon payment of the eighteen thousand dollars and twelve per cent. interest was not inconsistent with this purpose; nor was it fraudulent upon creditors of Collins. We have not for these reasons regarded this paper of 1844 as a *controlling* fact in the case, and we will now advert to two or three of those prominent circumstances which have led us to the conclusion to let the the judgment of the circuit court stand.

1. When a fraudulent purchase has been made to defeat or delay the vendor's creditors, or the creditors of the defendant in the execution if the transfer has been effected in this way, one of the most common, natural and prominent marks of the fraud is a disparity between the value of the property conveyed or purchased at execution and the price paid for it, or the debt for which it was sold. It is difficult to see how a creditor can use an execution sale to cover up property of his debtor from other creditors, where the value of the property is not greater than his claim. When we speak of an inequality we do not mean that it must be between the value of the property and the amount *bid for it* on the execution sales, but between its value and the actual amount of the indebtedness, whether the bids upon the property come up to that amount or not. This mark of fraud is totally absent from this case. It does not appear that at the date of the purchase under execution, or at any period from that down to the transfer of the property from Stacker to Morrison, the value of all the property bought by S. & E. exceeded or was equal to the amount of Collins' indebtedness to these parties. We do not say that the value of the property was exactly equal to, or certainly less than, the amount of the debt, be-

cause neither the one nor the other can be certainly determined; but our conclusion from the whole testimony is, that the property never would bring, at public sale or from private purchasers, the amount which Collins owed Stacker. Of course this is a matter about which there is contradictory testimony, but the weight of evidence is clearly this way. It ought to be, we think, very clearly the other way in order to justify the setting aside this sale for fraud. It is manifest that Stacker never thought the property equal to his debt, and it is clear that Erwin did not, as he sold the interest he represented at fifty per cent. below its nominal value. Collins' creditors did not seem to regard it in any other light, for the testimony shows that some of them, at all events, had ample facilities of getting the property from Stacker by paying up Collins' indebtedness. January was a large creditor, and was apprised of Stacker's wishes to realize his debt in money, and his willingness to let him or any of Collins' friends or creditors take the property. Collins, it is evident, could not procure any responsible man to undertake this. The sales to McConnell and Bowman were doubtless procured by him for this purpose, but they resulted in nothing but a change of title. It was not until the sale to Morrison that any considerable sum of money appears to have been realized. How much was obtained from the sale of the tract called the Gamble tract, does not appear; but the impression left upon our minds from all the testimony is, that Stacker never did realize from all the sales he had made the full amount of his claim upon Collins.

2. The apparent want of motive on the part of Stacker to put himself forward as a shield to protect Collins' property is a circumstance not easily reconcilable with the hypothesis of the plaintiff's case. Stacker and Morrison were men of large wealth. The former lived in Tennessee, and was a. member of the two mercantile houses to which Collins was largely indebted. He only occasionally visited St. Louis. Collins and McConnell and Bowman were not men of property—the two first were insolvent, and the last did not have.

35—VOL. XXVI.

the command of capital. They were all, to say the least, active and rather visionary speculators. In dealings between persons so differently situated, of such opposite pursuits and purposes, we might expect the transactions to present some discrepancies, and that they would be viewed in different lights, and intended for different purposes by the different parties engaged. Stacker, throughout, is apparently engaged in securing his debt. Morrison, so far as he appears in the affair, is manifestly seeking an investment of his capital at a high interest. Collins and McConnell and Bowman are looking forward to a great increase in the value of this property, and expecting the benefits of such rise. It might have so resulted. But these expectations were never realized. Collins died insolvent—the expected increase of value did not happen during his life—the schemes, participated in, no doubt, to some extent by all the parties, were never realized. Stacker had divested himself of all interest in the property at a sum which he says was insufficient to cover all the indebtedness of Collins; but he was not a resident here, and did not wish to invest capital in St. Louis. Morrison died after an ineffectual attempt to sell the property to Bowman. To suppose that Stacker, a citizen of Tennessee, came here in 1840 and, in conjunction with Erwin, bought under execution all the real estate of Collins upon a fraudulent agreement entered into with Collins to hold the property in trust for Collins, would seem, under the circumstances, rather a violent presumption. No satisfactory motives appear for such conduct on the part of Stacker & Erwin. The latter was merely an agent, and had no interest in the property or the debts, and yet such an agreement, if it existed, must have been known to him. His testimony is in the case, and such agreement is utterly denied. There is certainly no motive on the part of Erwin to have been a party to an agreement of this sort, and just as little in Stacker, since the agreement supposes that after the payment of the debt Collins was to have the property. What inducement could there be for Stacker to undertake this position, which would clearly re-

sult in Collins' benefit, and by which he himself could on no contingency make any thing ? It is very easy to understand that Stacker would willingly concede to Collins the privilege of redeeming the property, since Stacker was not a speculator in land, nor did he desire to own any in St. Louis. He only wished to secure his debt. This is, however, a very different matter from holding the property with a view to keep off the other creditors of Collins—a gratuitous office, for undertaking which some motives of friendship or relationship, or some real or supposed obligation, ought to appear.

3. But in reference to this particular lot, the right to which is now in controversy, the controlling circumstance which has governed our determination is the character and value of Collins' title to it in 1840, when the sale under execution was made. Collins had, in truth, no *available* title whatever to the Scott Hotel property in 1840. He had a remote equity which subsequent events might have ripened into something of a tangible and substantial title, but he had not a shadow of interest which could be worth any thing to his creditors, if that shadow had not been converted into substance by the outlays of large sums of money by Stacker. To the larger portion of this lot Collins had no title at all ; it was outstanding in the heirs of Forsyth. This title was subsequently acquired by Stacker at the sale made by Forsyth's administrator. The twenty-eight feet of ground remaining Collins had conveyed before the execution sale to De Munn, and De Munn had mortgaged it to De Angelis, and Stacker ultimately procured this title by purchasing at the sale made to foreclose the mortgage. To effect these purchases Stacker paid about seven thousand five hundred dollars to Forsyth's administrator—about four or five thousand dollars on the De Angelis mortgage, and one thousand for procuring Robert Forsyth's interest. He also expended six thousand dollars in rebuilding the hotel. What rights could Collins' creditors have in this lot ? What would be the value of their interest in it, if the title of Stacker and Morrison is subverted ? Did the plaintiff, at his execution sale, buy the titles which Stacker

had acquired subsequently to his purchase in 1840 ? Are these acquisitions to be transferred to him ? This suit is brought, as we have stated, to have this lot (called the Scott Hotel property) conveyed to the plaintiff, who was a creditor of Collins' for about eighteen hundred dollars, and who obtained a judgment for his debt, levied an execution on this lot, and bought it as Collins' at sheriff's sale. Collins' title was a very remote equity—reaching only about twenty-eight feet of the lot, and dependent on the existence of a secret trust between him and De Mun. There is no direct proof that any such trust actually existed, but circumstances tend to show that probably De Mun held the title for Collins. Conceding this trust, there is still a heavy encumbrance upon it. This encumbrance Collins was totally unable to remove. Stacker bought the title at the sale under the mortgage. To justify us in transferring this title to the plaintiff, the proof of fraud ought certainly to be perfectly satisfactory. The circumstances in evidence ought to be such as could leave no reasonable doubt upon an impartial mind. The case ought not to be one where half a dozen men would come to one conclusion, and another half dozen to the opposite. It ought to be clear. We do not so consider it. We are aware that there are many portions of evidence which have not been referred to, which present an unfavorable view of this case, and that the transactions to which we have particularly referred admit of a different construction from that we have placed upon them. But we have acted on the principle of giving the defendants the benefit of a construction favorable to the honesty of the transactions, when that construction would as well consist with the circumstances as a contrary one, and that where doubts are entertained as to the true construction to be given to the conduct of the parties, those doubts should be resolved in favor of the defendants.

Judgment affirmed ; Scott, J., concurring ; Judge Richardson not sitting, having been of counsel.