·JOSEPH R. RIDGE *et al.*, Respondents, v. GEORGE W. GREENWELL *et al.*, Appellants.

### St. Louis Court of Appeals, April 4, 1893.

1. **Fraudulent Conveyances**: PROOF OF FRAUD. Direct testimony in support of the *bona fides* of a transaction, which is attacked as fraudulent, may be overcome by impeaching circumstances. The criminating facts, however, must be of a character to lead a reasonable and fair-minded person to infer a fraudulent and dishonest purpose in spite of the sworn statements of the witnesses. If the evidence relied on to prove the fraud leads to no definite result, but only tends to cast suspicion on the transaction, or if it is as consistent with an honest as with a dishonest purpose, the finding must be against the alleged fraud.

2. ———: ———: RELATIONSHIP OF PARTIES. The relationship of the parties to a preference, given by an insolvent to one of his c reditors is not of itself sufficient to establish that the transaction was fraudulent as to other creditors.

*Appeal from the Monroe Circuit Court.*—HON. THOMAS H. BACON, Judge.

REVERSED.

*J. H. & G. W. Whitecotton* and *R. B. Bristow*, for appellants.

*R. N. Bodine* and *R. P. Giles*, for respondents.

BIGGS, J.—The plaintiffs are second mortgagees. The action is in equity against the assignees of the indebtedness secured by the first mortgage for the purpose of obtaining a decree for the cancellation of that indebtedness, and the release of the real estate from the lien of the first mortgage. The note secured by the first mortgage had been assigned to the defend-

ant, Hiram Greenwell, and by him assigned to his co-defendant Broughton as collateral. The contention of the plaintiffs is that the money paid by Hiram for the note belonged to George W. Greenwell, the mortgagor.

We find the following facts: In 1886 George W. Greenwell, the father of Hiram, failed in business. At the time Dr. Dysart held his note for $1,000, dated in 1884. The plaintiff Ridge was a surety on this note. Jacob L. Crow also held his note for $2,500, dated in 1886. Greenwell also owed D. H. Moss $1,000 and the plaintiff Parsons $480. On the nineteenth day of August, 1886, Greenwell and wife delivered to Crow a mortgage on one hundred and eighty acres of land (hereinafter referred to as the Crow land) to secure the note held by him. On the next day he delivered to Dysart and Parsons a second mortgage on the same land to secure their indebtedness. In this mortgage was included forty acres not covered by the first mortgage. About the same time he secured Moss by a third mortgage on one hundred and sixty acres of land, hereinafter designated as the Moss land.

In the fore part of the year 1887, Moss sold under his mortgage, and he became purchaser of the land. After paying off other incumbrances, the land, together with ten acres not included in either mortgage, cost him $2,600, not including a small balance due on his own debt.

In 1887 Moss rented his land to Hiram and his brother, Josiah, who continued to cultivate it until February, 1890. During the time they raised large crops of corn and fed it to cattle, hogs and horses. In 1887 Hiram, who was then under age, had a horse, cow and calf and thirty-five hogs; Josiah was married and lived on his own farm in the immediate vicinity, and owned considerable stock. They were sensible

and industrious boys with no bad habits. In the spring of 1888 Hiram contracted with Mr. Worland for sixteen head of two-year old steers, for which he agreed to pay $380. The trade was closed up in the name of Josiah, who executed his note, secured by chattel mortgage on the cattle for the purchase money. The reason assigned for this is that at that time Hiram was not quite twenty-one years old. These cattle were fed and cared for by Hiram until the fall of 1889, when he shipped them to Chicago for sale. At the same time he shipped and sold some hogs which he had raised and fattened on corn grown on the Moss land. The net proceeds of the sales amounted to between $1,400 and $1,500.

During this time the mortgages on the Crow land were not foreclosed, and the mortgagor was permitted to remain in possession of the land. When Hiram returned from Chicago he bargained with Moss for his land, agreeing to pay for it $3,256. At the same time he was negotiating for the Crow note, which James F. Crow, the agent of his father, J. L. Crow, agreed to transfer to him for the Moss land. In making the trades Hiram used $900 of the money received from the cattle and hogs, and borrowed $2,256 from his co-defendant Broughton, to secure which he assigned the Crow note as collateral. Moss made the deed directly to Crow, and in this way the matter was finally closed. The plaintiffs' contention was that George W. Greenwell furnished all the money to purchase the Crow note, and that it was assigned to Hiram and by him assigned to Broughton for the purpose of defrauding the second mortgagees.

On the hearing the court submitted the following issue to a jury, to which an affirmative answer was returned:

"Did the defendants, George W. Greenwell and Hiram Greenwell, in the purchase of the prior incumbrance, combine together for the purpose of wrongfully hindering or delaying Joseph R. Ridge in the collection of his surety debt against George W. Greenwell, or any part thereof?" The court adopted the finding of the jury, and in the decree found that the money paid by Hiram for the Crow note, except the amount loaned by Broughton, belonged to George W. Greenwell, and that the assignment to Hiram was for the purpose of defrauding the plaintiffs. The court also found that there had been paid on the note held by Broughton against Hiram about $700, which was also the money of George W. Greenwell. Foreclosure of both mortgages was ordered, with directions to pay from the proceeds the costs, next the amount due on the Broughton note, then the amounts due on the Dysart and Parson's debt *pro rata*, and the remainder, if any, to be paid to Hiram Greenwell. The defendants have appealed.

In the purchase of the Crow note Hiram used $900, a portion of the proceeds from the sale of the cattle and hogs in Chicago. The remainder was used in paying the Worland note, which was then held by Broughton. The simple question is, did the $900 paid by Hiram at the time of the purchase of the Crow note and the subsequent payments made to Broughton, amounting to $460, belong to George W. Greenwell. If so, then the plaintiffs, who are the beneficiaries in the second mortgage, were entitled to have the amounts credited on the prior incumbrance, it appearing that Ridge had paid the Dysart debt.

The trial judge found that the money paid by Hiram for the Crow note, outside of the amount loaned by Broughton, belonged to his father. It was uncontradicted that the amount paid at the time of the

transfer was derived from the sale of the cattle and hogs shipped to Chicago. He also found that the money subsequently paid to Broughton belonged to George W. Greenwell. Hence, we must infer that it was the opinion of the court that Hiram, in renting the Moss land and in purchasing the cattle from Worland and in raising the hogs, acted for his father. On these issues the direct and positive evidence greatly preponderates against the finding of the court.

Of course in the trial of causes involving fraud, direct testimony may be overcome by impeaching circumstances. Such criminating facts, however, must be of a character to lead a reasonable and fair-minded person to infer a fraudulent and dishonest purpose, in spite of the sworn statements of the witnesses. If the evidence relied on to prove the fraud leads to no definite result, but only tends to cast suspicion on the transaction, then the finding must be against the alleged fraud. *Waddingham v. Loker*, 44 Mo. 132; *Priest v. Way*, 87 Mo. 16; *Bernecker v. Miller*, 44 Mo. 102; *Dallam v. Renshaw*, 26 Mo. 544. Or if such facts may as well consist with an honest as a dishonest purpose, the presumption is against the party alleging the fraud. *Funkhouser v. Lay*, 78 Mo. 458; *Page v. Dixon*, 59 Mo. 43; *Rumbolds v. Parr*, 51 Mo. 592; *Henderson v. Henderson*, 55 Mo. 534; *Webb v. Darby*, 94 Mo. 621.

Now let us examine the evidence. It stands uncontradicted that Hiram and Josiah rented the Moss land for three years, and that their father was not known in the transaction and had nothing whatever to do with the cultivation of the land. Moss testified that he rented it to the boys; that their father had nothing to do with it; that it was cultivated by them; that they paid the rent, and that he (Moss) had nothing to do with their father. It is also uncontro-

verted that Hiram bought the cattle from Worland, which he afterwards sold in Chicago; that, by reason of his minority, Josiah gave his note to Worland for the purchase money, with a chattel mortgage on the stock; that thereafter the cattle were claimed by Hiram; that he fed them corn which was grown on the Moss land; that he shipped them to Chicago and sold them as his cattle. It is also shown by the evidence, and is uncontradicted, that Hiram raised and fattened the hogs (which he shipped to Chicago) on the Moss land; that he always claimed to own the hogs, and that he sold them on the market as his property. It is also an undisputed fact that George W. Greenwell was not a party to, and did not participate in, the trade for either the land or the note. Moss testified that he told Hiram, at the time he rented the land, that he would sell it to him at any time at cost, that is, what he had paid to redeem the land from prior incumbrances with his debt added; that at the time of the sale his claims amounted to $3,356, and that he agreed to discount this amount $100 if Hiram would make the trade, and that the proposition was accepted. This purchase also included ten acres of land which Moss owned in the same neighborhood, and Moss also agreed to transfer to Hiram the balance due on his jugdment against George W. Greenwell.

Touching the purchase of the Crow note, the only testimony which in any way connected George W. Greenwell with the transaction was that of Jacob L. Crow, who testified that some time prior to the transfer of the note George W. Greenwell spoke to him about selling the note to Hiram.

In reference to the subsequent payments to Broughton, amounting to $460, Broughton testified that Hiram paid the money, and that George W. Greenwell was in no way interested in the note. Hiram

claimed that he received $275 of the money from the sale of a pair of mares; that he sold a lot of hogs for $160, and that he had $25 in money which he had received from another source. He is corroborated by Broughton and Josiah.

In support of the judgment the plaintiffs rely on a declaration, made by George W. Greenwell, to the effect that he owned the cattle and hogs. The plaintiffs 'proved by one or two witnesses that, while Hiram was in Chicago with the cattle and hogs, George W. Greenwell made the statement in Shelbina that he had sent some stock to Chicago, or that he had some stock on that day on the Chicago market. Proof of oral declarations is considered weak and unsatisfactory, because of the liability of the hearers to be mistaken as to what was actually said, and the meaning intended. But, as George W. Greenwell was not called to deny the statement, it may be assumed that he made it. This, however, ought not to weigh much against Hiram, because he was not present and had no opportunity to contradict the statement, and there is no evidence that it was ever communicated to him and that he failed to deny it. On the contrary the fact is established by the testimony of many witnesses, that he always claimed the stock and that his father had nothing whatever to do with it.

The plaintiff Ridge testified that, in the spring of 1889, he had a conversation with Hiram about the stock and the Dysart debt. He stated that Hiram said to him: "I think this fall we will be able to pay the Dysart debt, or the most of it; I think we can pay it this fall." Hiram flatly denied this. His credibility as a witness is unimpeached, so this alleged statement must be regarded as unproved.

During the three years that Hiram cultivated the Moss land he pastured his stock on the Crow land, in

consideration of which, as he alleges, he was to support his father and mother, which he did.    There is nothing to suggest fraud in such an arrangement.    The mortgagees left the Crow land in the possession of George W. Greenwell, and he utilized it for his support.    He was probably so advanced in life that he could not perform manual labor, and, being without means or credit upon which he could operate it, it was natural for him to turn over the land to his unmarried son, in order that he and his wife might be secure in a living.

It is insisted that the Crow note was entitled to a credit of three or four hundred dollars, which Hiram in his purchase got the benefit of.    This statement is not supported by the evidence.    Crow said that the note was not legally entitled to any credit; that it was a renewal of other notes which had been running at a high rate of interest, and that, after George W. Greenwell had failed, he insisted that he ought to refund to him some of the interest on the old notes. Crow offered to give the renewal note credit for something, but Greenwell said that he wanted the benefit of the credit himself.    All of the witnesses testified that in the sale of the note to Hiram no deduction was made on that account.    It will be thus seen that the offer of Crow was a mere gratuity, and the refusal of Greenwell to have the credit entered on the note in no way prejudiced the legal rights of the second mortgagees.

It is claimed by Hiram that, after the purchase of the Crow note, he sold a pair of mares for $275 and that he paid the money to Broughton.    It is insisted, and the court so found, that the mares belonged to George W. Greenwell.    It appears that, when the latter failed, he owed his son Josiah $1,100.    To secure this indebtedness a chattel mortgage was given on nine horses, including the mares sold by Hiram.    After the

failure the horses were surrendered to Josiah in satisfaction of the debt, and in 1888 he sold five of them, including the mares, to Hiram. These facts were established by uncontradicted evidence. We must assume that the court found that the alleged debt due to Josiah and the chattel mortgage were fraudulent. As we read the record, this conclusion must rest only on the relationship of the parties, which of itself is not sufficient to establish fraud. *Renny v. Williams*, 89 Mo. 139.

We have gone through the record with great care, and we are forced to a conclusion different from that reached by the circuit court. The evidence relied on by the plaintiff to impeach the good faith of the purchase of the Crow note does not lead to any definite conclusion, but leaves the question in doubt. If the question be doubtful under the evidence, it is our duty to solve the doubt in favor of Hiram, for that would be in favor of honesty and fair dealing. *Webb v. Darby*, 94 Mo. 621.

With the concurrence of the other judges, the judgment of the circuit court will be reversed, and the suit dismissed. It is so ordered.