———O———

WILLIAM W. AND JAMES A. HENDERSON, Respondents, *vs.* JAMES HENDERSON, SR., WASHINGTON A., JAMES A., AND GEORGE S. HENDERSON, Appellants.

1. *Land titles—Action to set aside deed—Change of venue—Jurisdiction—Construction of statute.*—In a proceeding to set aside a conveyance of lands, venue may be changed from the county in which the land is situated, and the court to which the cause is so removed will thereby obtain jurisdiction of the *res*. This proposition is not in conflict with the Practice Act. (Wagn. Stat., 1005, § 3.)

2. *Want of jurisdiction over subject—Right to take advantage of, never lost.*—The want of jurisdiction over the subject matter of an action may be taken advantage of at any time.

3. *Change of venue—Failure to transmit papers—Discontinuance, etc.,—Motion to dismiss—Appearance.*—A case, sent by change of venue from one court to another, is not discontinued by reason of the failure of the clerk to transmit the transcript before the third term after the date of the order. The statute (Wagn. Stat., 1357, §12), is directory merely. But *semble*, that where the other party appears in the court to which the cause is removed, at the second term after date of the order, produces the order, and prays a discontinuance on the ground that no transcript has been sent over, the court may be justified in dismissing the cause. But it is otherwise, where the parties appear and go to trial.

4. *Practice, civil—Supplemental answer—Leave to file at close of evidence, etc.*—It is a matter resting in the discretion of the Circuit Court under the circumstances of the case to allow or forbid the filing of a supplemental answer, after the evidence is closed. Where, for example, the facts proposed to be set up might have been discovered by use of ordinary diligence, and it did not appear that the refusal would work a prejudice to the applicant, the court acted properly in refusing permission to file such further pleading.

5. *Practice, civil—Deed—Allegation of record—Proof of loss and contents.*—The allegation in a petition that a deed had been recorded, will not prevent plaintiff from proving that in fact it had not been recorded, and further proving its loss and contents

6. *Lost instrument—Acknowledgment—Court, entry of—Parol evidence.*—Where a deed was shown to be lost or destroyed, held, that the grantee was not compelled to introduce an entry of its acknowledgment which had been made in open court, as the best evidence of the execution of the instrument, but might resort to parol evidence.

7. *Fraud not presumed, when.*—Fraud will not be presumed, when all the facts in the case consist as well with honesty and fair dealing as they do with the intention to defraud.

8. *Fraudulent conveyance—Vendee must have notice, etc.*—In order to defeat the title of a purchaser from one who conveys lands with a fraudulent intent, the vendee must have notice of the intent, or participate in the fraud.

9. *Fraudulent conveyances, made to defeat certain creditors—Effect of.*—A debtor may convey his property to a portion of his creditors to the exclusion of others, but if the intention of such conveyance be to defeat certain other creditors, the deed as to them is fraudulent, and (the vendee being cognizant of the intent) is void.

### *Appeal from Platte Circuit Court.*

*Thos. McCarty, Routt & Rucker, and D. C. Allen,* for Appellants.

I. This action is *in rem.* (Wagn. Stat., 1005, § 3; Han. & St. Jo. R. R. vs. Mahoney, 42 Mo., 469-471; Doe vs. Oliver, 2 Smith's Lead. Cas., § 585; Freeman Judg., pp. 504-6 § 606.)

II. Neither acquiescence nor consent, can confer jurisdiction. (Germond vs. People, 1 Hill, 343; Dudley vs. Mayhew, 3 Com., 9; Clyde & Rose Plankroad vs. Parker, 22 Barb., 323; Freeman Judg., § 120, and authorities there cited; Bangs vs. McIntosh, 22 Barb., 591.)

III. The law requires transcripts on change of venue to be filed at or before the second term after the order. (Wagn. Stat., pp. 1356-7, §§ 7, 12.)

IV. James Henderson, Sr., had the undoubted right to prefer one creditor over another. (Cason vs. Murray, 15 Mo., 378; Drury vs. Cross, 7 Wallace, 302; Tompkins vs. Wheeler, 16 Peters, 106; Marden vs. Babcock, 2 Metc., 99; Auburn Ex. Bank vs. Fitch, 48 Barb., 344.)

V. The petition alleges the acknowledgment and record of the deed. Witness Hardwick says it was not recorded. A par-

ty cannot contradict his own pleadings. Such testimony would operate a surpise on the other party, and on that score was wrong.

VI. A copy of the record entry of the acknowledgment, was, after proof of loss, the next best evidence. (Wagn. Stat., 612, §§ 56-7; Greenl. Ev., [Ed. 1859,] p. 119, § 82, p. 124, § 86, p. 127, § 88; Commonwealth vs. Kinison, 4 Mass., 646; Waterman vs. Robinson, 5 Mass., 309; Philipson vs. Bates, 2 Mo., 116; Milan vs. Pemberton, 12 Mo., 598; Medlin vs. Platte Co., 7 Mo., 235; 1 Phillips on Evidence, 588.)

*E. H. Norton, J. E. Merryman and Samuel Hardwick*, for Respondents.

I. After the order, the Platte Circuit Court had jurisdiction. The statute (Wagn. Stat., 1356-7, §§ 7, 12;) is directory. (Sedg. Stat. & Const. Law, pp. 368, 372.) By appearing to the suit in that court, they waived objections to venue. (Powers vs. Browder, 13 Mo., 154; Smith vs. Elder, 3 Johns, 105; Street vs. Chapman, 29 Ind., 142; Burnham vs. Hatfield, 5 Blackf., 21; Gilstrap vs. Felts, 50 Mo., 428.)

II. And a party may recover upon parol evidence of the contents of a deed, when it is lost. (Smith vs. Phillips, 25 Mo., 557; Newman vs. Studley, 5 Mo., 291; Jackson vs. Rice, 3 Wend., 183; 3 Yates, [Penn.] 184.)

III. The testimony raises the presumption, that Henderson's conveyance was designed to defeat his creditors, and in an equity case like this, fraud may be presumed. (King vs. Moon, 42 Mo., 551.)

Vories, Judge, delivered the opinion of the court.

This action was originally brought in the Clay Circuit Court to set aside a conveyance of certain lands described in the petition, situate in Clay county, on the ground of fraud. The cause, after the action was commenced, was taken to the Circuit Court of Platte county, by change of venue.

The charges in the petition were as follows: That on the first day of June, 1856, defendant James Henderson, was in-

debted to one George Henderson on a promissory note for $6,500; that on the 31st day of March, 1859, George Henderson died, and Wm. W. Henderson, one of the plaintiffs, became his administrator; that said note came into his hands as part of the assets of the estate, and that he instituted suit on the same and recovered judgment against said James Henderson on said note; that execution was issued on said judgment and levied on the land described in the petition, and sold at sheriff's sale, and plaintiffs became the purchasers. The petition further states, that on and before the 24th day of July, 1860, and at different times, said James Henderson, with intent to avoid the payment of the said debt and to defeat said Wm. W. Henderson in collecting it, attempted to dispose of said lands for that purpose; that, to accomplish that object, he conveyed said land by mortgage with power of sale to David M. Rivers, and others therein named, said mortgage being the same that was recorded in Record Book "R." page 631, of the records of Clay County, all of which were recited to be for the purpose of securing certain debts therein described, all of which debts if real and *bona fide* on the part of the mortgagees, were contracted, by said James Henderson, with the fraudulent intent, to cheat, wrong and defraud said Wm. W. Henderson in collecting said debt; that said James Henderson disposed of property, much of which had been procured by notes secured by said mortgage, and placed the same and other monies and means of said James Henderson, in the hands of Geo. S., Jas. A. and Washington A. Henderson, who were the sons of James Henderson, and pursuant to said fraudulent intent and covenanting with said Washingthn A., George S. and James A. Henderson, he did procure that the land be conveyed by a pretended sale under said mortgage; and by virtue of such pretended sale, said James Henderson procured that a deed be executed by certain of said mortgagees, purporting to convey said real estate to said W. A., Geo. S. and James A. Henderson, the said sons of James Henderson, which deed was recorded in Record Book "U." page 304; that if any monies were paid at said pretended

sale, they were the monies of said James Henderson. Wherefore, plaintiffs charge that said deeds are fraudulent and void, and ask that the court will so declare, and for other proper relief, &c.

To this amended petition the appellants Washington A. Henderson, James A. Henderson and George S. Henderson, filed their separate answer, in which, after admitting that James Henderson, Sr., was their father; that he executed the mortgage dated July 24th, 1860, set out in the amended petition; that said land was sold under said mortgage, January 30th, 1861; that prior to January 30th, 1861, their father owned the lands in controversy; that the deed to them from the mortgagees of James Henderson, Sr., mentioned in the amended petition, was made, &c., and alleging that the mortgage of July 24th, 1860, and debts therein mentioned were *bona fide*, they denied specifically and fully all of the other allegations in the amended petition. The answer then stated that the father and co-defendant of said defendants on the 24th day of July, 1860, (the date of the mortgage named in the petition) was indebted to Joseph Thompson, S. S. Major, Wm. McIlvaine, L. W. Laville, David M. Rivers, George E. Claybrook, David Willis, Washington Huffaker, John A. Denny, Thomas M. Gozney, Martha Marsh, Thomas Suter, William Atchison, and to the Farmers' Bank in various sums of money, amounting in all to a sum of between eight and ten thousand dollars, besides interest thereon, and that Thomas Gozney, Horace Anderson, Anthony Haizel and John M. Wilkerson, were the sureties for said James Henderson, Sr.; for the payment of a part of said debts; that said debts were secured or evidenced by promissory notes, executed by said James Henderson, Sr.; that their co-defendant James Henderson, Sr., on said 24th day of June, 1860, executed the mortgage named in the petition, in order to secure said debts and to save his sureties thereon; that the mortgage was executed to a portion of the persons to whom he was so indebted, conveying to them the land in controversy with personal property therein named; that said

mortgagee, contained a power in favor of the grantees therein, or any three of them, to sell the property named in the mortgage, at any time after the 1st day of January, 1861, at public sale to the highest bidder, after giving notice &c., and with the proceeds of the sale to pay first, the expenses of the trust, and next, whatever might remain unpaid upon the debts named in the mortgage, either of principal or interest, and the remainder, if any, to be paid to the mortgagor.

The answer then further states, that the said debts were not paid, and that the mortgagees on the 31st day of January, 1861, after having given the notice required, (20 days) sold· the land in controversy in conformity with the provisions of the mortgage ; and that the said defendants were the highest bidders at said sale for the land in controversy, and became the purchasers thereof for the sum of $2150.00, which said sum was paid and the land conveyed to them under the power in the mortgage ; that they purchased the land in good faith and paid therefor without fraud.

In the separate answer of James Henderson, Sr., it was further alleged, that on and before July 24th, 1860, he was *bona fide* indebted to the persons, and in the amounts named in the said mortgage; that said mortgage was executed by him in good faith to secure the payment of such debts ; that he executed said mortgage dated July 24th, 1860, to the mortgagees named in it ; that he failed to pay the debts in said mortgage mentioned, that certain of the mortgagees named in said mortgage, acting under the power granted to them therein, sold the property· real and personal, mentioned in the mortgage on the 30th day of January, 1861 ; that at such sale, his co-defendants became the purchasers in good faith of all the lands mentioned in the mortgage for the sum of $2,115 ; that the mortgagees conducting such sale, made·his co-defendants a deed to said lands in due form, transferring to them all of the interest therein of him, James Henderson, Sr.; that no part of said sum of $2,115, bid and paid by his co-defendants, for said lands, was his property; and that he since the 30th of January, 1861, has not had nor has he now, any interest in said lands.

The answer of James Henderson, Sr; did not deny his indebtedness to the estate of George Henderson, or the judgment in favor of William W. Henderson, his administrator, thereon, or the execution, levy, sale and sheriff's deed to plaintiffs as is stated in the petition, but he expressly denied the allegations of fraud. To these answers, the plaintiffs filed replications, putting in issue the affirmative allegations therein. At the March term of the Clay Circuit Court for the year 1871, the plaintiffs filed their motion for a change of the venue of said cause, which motion was sustained by the court, and the venue changed to the Platte Circuit Court, and the clerk of the Clay Circuit Court was ordered to certify and transmit a copy of the record and the papers in the cause to the Platte Circuit Court.

Afterwards, at the October Term of the Platte Circuit Court in the year 1872 (that being the first appearance of either party in said court), the plaintiffs appeared by their attorney, and upon their motion the case was continued to the next term of the court at their costs, for which judgment was rendered. Afterwards, at the next April term of said court, leave was granted to the plaintiffs to withdraw the transcript filed in the cause for the purpose of having the same corrected, and the cause was set for trial on Tuesday, the 7th day of said Term.

On the 14th day of April, 1873, both parties appeared in the Platte Circuit Court by their respective attorneys, when the defendants filed a motion to dismiss the suit and strike the cause from the docket (it being stated in the motion that the defendants appeared only for the purpose of the motion), because the transcript was not filed as required by law; because the papers and transcript when filed, were filed on the 18th day of March, 1872, and were certified without any seal of the Clay Circuit Court being affixed; because no transcript with the seal affixed was filed until the 11th day of April, 1873; because the court improperly allowed the plaintiffs to withdraw the transcript for the purpose of having the seal of the Clay Circuit Court attached to the record; because no transcript or

record of the cause, certified under the seal of the Clay Circuit Court, was filed at or before the second term of the Platte Circuit Court after the order for the change of venue was made, but that three terms of said court had elapsed since the venue had been changed, and because the failure to file the transcript in time, had worked a discontinuance of the cause, and the Platte Circuit Court had no jurisdiction thereof.

It was shown on the hearing of said motion, that no transcript of said cause was filed in the office of the Clerk of the Platte Circuit Court until the 18th day of March, 1872, and that the transcript when filed had no seal of the Clay Circuit Court affixed thereto until the 11th day of April, 1873. It was also shown upon the hearing of said motion, that the defendants caused subpœnas to be issued for witnesses in said cause on their behalf at the October Term of the court in the year 1872, and also at the April Term, 1873. The court overruled the motion and the defendants excepted. On the 15th day of April, 1873, both parties appeared and a jury was impaneled in the cause. The jury was afterwards discharged by the agreement of the parties, and by their further agreement the issues in the cause were submitted to the court. During the progress of the trial, the plaintiffs offered to and did show, by evidence, that the original deed from the sheriff of Clay County to the plaintiff for the land in controversy, had been filed with the original petition in the Clay Circuit Court at the commencement of the action; that it was attached to the petition ; that it had by some means unknown become detached, and after diligent search in all proper places could not be found, and that it had never been recorded so that a copy could be procured. The plaintiffs offered to prove the contents of the deed by parol evidence. The defendants objected because it was stated in the petition that the deed was recorded and filed with the petition in the cause. These objections were overruled by the court, and the contents of the deed proved to be in the usual form and executed to the plaintiffs jointly. To the action of the court in overruling the objections of the defendants to this evidence they at the time

excepted. The defendants also objected to all evidence offered by the plaintiffs upon the trial of the cause, on the ground that the court had no jurisdiction of the cause, for the reason that the case had been discontinued on account of the failure of the Clerk of the Clay Circuit Court to file in the Platte Circuit Court a transcript and the papers in the case on or before the second term after the granting of the change of venue. This objection being overruled the defendants excepted. At the close of the evidence and before the case had been argued and finally submitted to the court, the defendants asked leave of the court and offered to file a supplemental answer on the part of James Henderson, Sr. The court refused to permit said supplemental answer to be filed, to which ruling of the court the defendants again excepted. The court rendered a judgment and decree in favor of the plaintiffs, declaring the deed made to the defendants, James A. Henderson, Sr., Samuel Henderson and Washington Henderson to be void, and vesting the title to the land in controversy in the plaintiffs as prayed for by the petition. The defendants in due time filed their several motions for a new hearing and in arrest of judgment, assigning as causes therefor the rulings of the court hereinbefore excepted to, as well as that the decree was for the wrong party and against the evidence, and all other causes usually assigned for such motions. The court overruled these motions. Defendants excepted and appealed to this court.

There are several points presented by the record in this case for the consideration of this court. It is first contended by the appellants, that the Platte Circuit Court had no jurisdiction of the cause; that the motion of appellants to dismiss the case from the docket ought to have been sustained by the court. The ground of this motion which is relied on by the appellants is, that the transcript of the record of the Clay Circuit Court with the papers in the cause were not filed in the Platte Circuit Court, or in the office of the Clerk thereof, at or before the second term of the Platte Circuit Court, after the venue was chang-

ed in and from the Clay Circuit Court, and that the case was thereby discontinued; that this being an action to recover— or affecting—real estate, the action is local, and the Platte Circuit Court could have no jurisdiction thereof, even if the parties on both sides had appeared without objection.

Our statute provides, that suits whereby the title to any real estate may be affected, shall be brought in the county where some part of such real estate may be situated. (Wagn. Stat., 1005, § 3.)

This of course would give the original jurisdiction over this case to the courts in the County of Clay, where the land is situated; but the cause was removed from Clay county by change of venue ordered in the Clay Circuit Court. The statute concerning changes of the venue in causes, after providing the manner in which a change of venue may be taken from one county to another, further provides, that "when any such order shall be made by the court or judge, the clerk shall immediately make out a full transcript of the record and proceedings in the cause, including the petition and affidavit and order of removal, and transmit the same duly certified, together with all of the original papers filed in the cause and not forming a part of the record, to the clerk of the court to which the removal is ordered; and for failure to do so shall forfeit one hundred dollars to the party aggrieved, to be recovered by civil action." (Wagn. Stat., 1356, § 7.)

By the 12th section of the same act it is provided, that "If any clerk fail to transmit the transcript and papers in any cause when the venue thereof has been changed; or if the papers be sent and lost, such loss or failure shall not operate as a discontinuance of such cause, but the same may be filed at the next term of said court, or if lost, copies of the original may be furnished and filed, and the court shall proceed as if no such failure or loss had happened.".

It is insisted by the appellants, that the papers in this case were not filed in the office of the Clerk of the Platte Circuit Court until the third term thereof after the order changing the venue was made, and that therefore the

cause was discontinued, and the Platte Circuit Court could have no jurisdiction of the cause. There can be no doubt but that the original jurisdiction of the cause was in the Clay Circuit Court, and that originally the Platte Circuit Court had no jurisdiction over the subject matter of the action. And there is no doubt that the want of jurisdiction in the court over the subject matter in an action can be taken advantage of at any time. In this case when the order was made by the Clay Circuit Court, changing the venue of the cause to the Platte Circuit Court, its effect and operation was to confer jurisdiction over the subject matter of the action on the Platte Circuit Court. This jurisdiction was conferred as soon as the order was made; but the Platte Circuit Court did not become possessed of the action until the papers were filed or some other action taken by the parties in said court.

The statute required or directed the Clerk of the Clay Circuit Court to make and transmit a transcript and the papers in the cause to the Platte Circuit Court or the clerk thereof, by the next term of the court, or if, for the causes stated in the statute, the clerk should fail to file the papers at the first term of the court, he was directed to transmit them by the next term. The filing of the papers was not to give the court jurisdiction of the subject matter of the action. The object of the Legislature was to insure a speedy trial; the jurisdiction was conferred by the order of the court changing the venue, and the filing of the papers in the court to which the venue had been changed was only one of the necessary steps to be taken in the progress of the cause. It is, however, contended, that if the papers were not filed in the office of the Clerk of the Platte Circuit Court, at or before the second term, the cause was necessarily discontinued. The statute does not say that the suit shall be discontinued if the papers are not filed by the second term. It only provides that the suit shall not be discontinued if they are not filed by the first term. We think the statute to be only directory. It directs a public officer to perform a duty devolved on him in a prompt manner, and in order to secure this promptness a pen-

alty is inflicted or provided for a failure in the officer to dis-charge the duty imposed. The court should see that the parties are not surprised or injured by the failure of the clerk to perform his duties, and if the papers are not filed until after the time fixed by law, the parties should be notified of the filing of the papers in time to prepare for the trial. But the time fixed for the filing of the papers is not so essential or imperative as to necessarily work a discontinuance where the law is not strictly complied with. The statute being only directory, if the parties, as in this case, appear and go to trial, it is sufficient. (Sedgw. Stat. & Const. Law., 372, 373 ; also 368 to 370 and cases there cited.) If the defendants had appeared in the Platte Circuit Court at the second term after the venue was changed, produced the order changing the venue, and filed their motion to discontinue the cause for the reason that no transcript had been filed, and the plaintiffs had then failed to file a transcript, it may be that the court would have been justified in dismissing the cause. But it seems that at the term of the Platte Circuit Court before the one at which the appellants filed their motion to dismiss, they had their witnesses subpœnaed and in attendance, and the cause was continued at the costs of the plaintiff.

Hence, defendants must have known that the case was there and that they were themselves accumulating costs in the case; and after their motion was overruled they agreed to go to trial, consented to discharge a jury that had been sworn in the case, and agreed to a trial before the court. It is therefore too late now to raise the objection that they and the cause were not properly in court. (Gilstrap vs. Felts, 50 Mo., 428 ; Street vs. Chapman, 29 Ind., 142; 5 Blackf., 21.) The court did right to permit the plaintiff to have the transcript properly certified by affixing the seal of the Clay Circuit Court to the certificate of the Clerk.

It is also insisted by the appellants that the court erred in refusing to permit James Henderson, Sr., at the close of the evidence to file a supplemental answer. This was a matter for the discretion of the court under the circumstances of the

case. The facts discovered, which it was proposed to set up in the supplemental answer, could have been discovered by ordinary diligence before the commencement of the trial; and the defendant had already filed an answer in which he had wholly disclaimed any interest whatever in the land in controversy, so that it cannot be seen how he could be benefited by the answer he offered to file. The court therefore properly refused to permit the supplemental answer to be filed. (Harrison vs. Hastings, 28 Mo., 346.)

It is further insisted by the appellants that the Circuit Court, wrongfully permitted the plaintiffs to prove the contents of the deed of the sheriff of Clay county, to plaintiffs, after proofs that it had not been recorded and was lost. This evidence was objected to, on the ground that it was stated in the petition, that the deed was recorded and filed with the petition in the cause. It is sufficient to say that the evidence shows that the deed was filed with the petition, and afterwards lost from the papers, and could not be found. The allegation in the petition, that the deed had been recorded was wholly immaterial, and did not preclude the plaintiffs from proving that it had not in fact been recorded, and that no copy could be procured.

It was further objected to the evidence of the contents of the deed that the law required the deed to be acknowledged in open court, and the clerk was required to enter the acknowledgment upon the records of the court, and that this entry would be better evidence of the contents of the deed, than any parol evidence could be. The entry made by the clerk of the acknowledgment of the deed formed no part of the deed. The entry of the acknowledgment on the deed is what formed a part of the deed, and upon which the plaintiffs must rely for their title to the land. The entry made by the clerk upon the record could not even have been resorted to by plaintiffs as evidence to perfect the deed, if the entry on the deed had been defective, and of course could not have been substituted for the entry made on the deed. Hence it follows that parol evidence was properly resorted to. (Smith vs.

Philips, 25 Mo., 555; Newman vs. Studley, 5 Mo., 291; 1 Greenl. Ev., § 84, note 2, §§ 509, 560.) And if the entry made by the clerk upon the record is not correct, that fact would not affect the deed. (Scruggs vs. Scruggs, 41 Mo., 242; Crowley vs. Wallace, 12 Mo., 143.) The objection made by the appellant that it was not shown, that the sheriff's deed was stamped, was not made in the Circuit Court, and will not be noticed here.

The remaining ground for the reversal of the judgment of the court below is, that the judgment is not sustained by the evidence, and therefore that the judgment should have been in favor of the defendants upon the merits of the case. The ground for relief relied on by the plaintiffs in the petition is, that James Henderson, Sr., was, at and before the 24th day of July, 1860, indebted to one William W. Henderson as administrator of the estate of George Henderson, deceased, in the sum of six thousand five hundred dollars, together with interest at the rate of ten per cent. per annum, from the first of June, 1856, which was evidenced by his promissory note of that date; that in order to defeat, and hinder and delay the collection of said debt, he attempted to dispose of his property including the land in controversy; that in order to place his property beyond the reach of this creditor, he contracted a number of either real or pretended debts, and with the pretended view of securing these last named debts, he, on the 24th day of July, 1860, conveyed the land in controversy by a deed of mortgage with a power of sale to David M. Rivers, and others therein named; that the debts pretended to be secured, if real debts, were contracted with the fraudulent intent to hinder and delay the said William W. Henderson in the collection of his said debt; that in the creation of the debts pretended to have been secured by said mortgage, the said James Henderson, Sr., acquired a large amount of property which was disposed of by him, and the money received therefor, together with other monies, then had by him, was placed in the hands of his three sons, and co-defendants, George, James A. and Washington Henderson, and

pursuant to said fraudulent intent to hinder and delay the collection of said debt, due to William W. Henderson as administrator, he procured the land in controversy to be sold under and by virtue of said mortgage deed, and conveyed to his said three sons; that whatever money was paid for said land at said pretended sale to his said sons, was the money of said James Henderson, Sr. Wherefore, it is charged, that the deed conveying said land to said George A., James A. and Washington Henderson, was fraudulent and void, as to said William W. Henderson, who was a creditor as aforesaid, and that plaintiffs, having purchased all of the right or title of the said James Henderson, Sr., in and to said land, under and by virtue of an execution issued on a judgment obtained against said James Henderson Sr., on the debt in favor of William W. Henderson aforesaid, have a right to avoid said deed to the three sons, and hold the land free from any claim or right on their part by virtue of their said deed. These charges of fraud and fraudulent intent were denied by the defendants.

From the evidence presented in the bill of exceptions, it appears that James Henderson, Sr., who is the father of the other defendants, was in the months of June and July, 1860, indebted to some fifteen or sixteen persons living in Clay County Missouri, in the aggregate sum of about eleven thousand dollars, the most of which debts were contracted in said months of June and July, 1860, for mules ; that he at or about that time, took to the State of Kentucky, the mules numbering from 75 to 100 ; that he was then indebted to the said William W. Henderson in the sum before stated ; that after having disposed of the mules taken to Kentucky, James Henderson, Sr., returned to his residence in Clay county, Missouri, in July, 1860; that about the time he started to Kentucky with the mules, a letter was received from the attorney of William W. Henderson, addressed to James Henderson, Sr., Clay county Mo., to which the defendant Washington Henderson the oldest of the three sons wrote the following reply :

"Liberty, Clay County, Missouri, June, 18th, 1860.

" Cousin Will: I received a letter for my father from Mr. Coleman of St. Louis, yesterday, stating that he had father's note that you had given him for collection. Father is at this time in Kentucky and will not be at home for a month or six weeks; but he expects to see you as he returns; but, if he should not, he will write or come and see you as soon as he comes home, and I will ask you if you please to not force us to pay the whole amount right away. The amount is much larger than I had any idea that my father owed, and I hope you will have mercy, and give us a chance to pay you, without sacrificing what little we have got, and have worked so hard to get from our childhood to the present time; and if God gives health and strength we will continue to work until you are paid, and that shall be as fast as we can make it. We have a hard and slow way of making money, but I pray God to spare me to see the day that we will owe no man anything. Write to me as soon as you receive this please.

Respectfully, W. A. Henderson."

On the same day Washington A. Henderson wrote to the attorney Coleman, as follows:

"Mr. Coleman, Dear Sir: I received your letter to my father yesterday, and he is in Kentucky at this time. When he comes home he will act in the matter, and I ask you if you please to wait until you hear from him. I sent a letter to cousin Will Henderson to day, directed to St. Louis, and if his post office is not that, I wish you would do me the favor to see that he gets it."

On the 25th day of September, 1860, James Henderson, Sr., forwarded to Coleman a letter in the handwriting of his attorney, Thos McCarty, as follows:

"Dear Sir: Yours of the 19th inst. is before me, containing a proposition, from William Henderson, as the administrator of his father's estate. With every disposition on my part, to do all I can towards a settlement of the matter, I find it impossible to accept the proposition, and therefore notify you at once, that I decline acceding thereto, in order that you

may be prepared to take such course in the premises as duty and the law requires."

The evidence further shows that James Henderson, Sr., executed a note to one George E. Claybrook, in Clay county, Missouri, on the 28th day of June, just ten days after the date of the letters written by Washington Henderson to Will Henderson and Coleman; and the evidence also tends to show, that James Henderson, Sr., started to Kentucky with his mules on the 28th day of June, 1860. It is further shown, that Henderson, Sr., returned from Kentucky in July, 1860, and at once began to arrange with his creditors in Clay county, to give them a mortgage to secure his indebtedness to them. His creditors, all who were examined, state that they were not pressing him for their money, but that he voluntarily proposed to give them a mortgage on his land and other property; that he visited a number of them and requested them to have their debts put in the mortgage, telling one of them that he wanted to give the mortgage; that "he might be sued on an unjust debt," and suggested putting the witness' debt in the mortgage. All of the notes of the home or Clay county creditors were sent to Thomas McCarty of Liberty, who was retained as the attorney of Henderson in reference to the debt of William W. Henderson. On the 24th day of July, a mortgage was executed by James Henderson, Sr., by which he conveyed to five or six of his creditors two hundred and fifteen and one-half acres of land (the land in controversy), together with his personal property, to secure the debts in Clay county, amounting to about eleven thousand dollars. This mortgage contained a power of sale, by which it was provided, that if the debts were not paid by the 1st day of January, 1861, the mortgagees could give twenty days' notice and sell the property. On the same day another mortgage was executed to G. W. Morris, to secure a debt of five hundred dollars. The first named mortgage included the land in controversy as well as a negro woman, horses, mules, oxen, cows and calves, hogs, fifty barrels of corn in the crib, a stack of oats, wagons, wagon harness and plow gear.

Immediately after the first of January, 1861, the property mortgaged was advertised for sale under the power in the mortgage. The notes, to secure which, the mortgage was executed, were all placed in the hands of McCarty, the attorney employed or consulted by Henderson, Sr., in the suit on the note of W. W. Henderson. The sale took place on the 30th day of January, 1861. The most of the creditors provided for in the mortgage were present at the sale; some of them purchased portions of the personal property, but none of them bid on the land. The land with other portions of the personal property was purchased by the three sons of James Henderson, Sr., and in fact the mortgagees not only sold the property conveyed by the mortgage but they sold seven plows, which were also purchased by the three sons of Henderson, Sr. There was but one bid on the land; that bid was ten dollars per acre, for which the land was sold to the boys. The whole amount of the sale was $3807.95 : Of this the boys purchased to the amount of $2397.55, and the creditors and others, to the amount of $1430.40. The evidence shows that the land was at the time worth from $3,300 to $5000. The creditors who were examined as witnesses, and whose debts were secured by the mortgage, gave as a reason for permitting the land to be sold to the boys for less than its value without bidding thereon, that they considered their debts good, did not want land; that they had confidence in the boys and in the old man; believed the old man was good for his debts; and one of them stated that he had been assured, by a confidential friend, that his debt would be paid. The evidence further shows that James Henderson, Sr., with his wife and his three sons (the other defendants), previous to and at the time of making the mortgages resided on the land in controversy; that it was a finely improved farm, with a good brick dwelling house, a good barn, and other out-houses; that the business was all done in the name of the old man, up to the time of the sale under the mortgage; that since the sale, the business has been done in the name of the boys; but that the family otherwise

reside on the farm since the sale, just as they did before, and that the old man is still so in possession, one of the boys lately having moved to Nebraska; that no money was paid by the boys for their purchases at the sale made under the mortgage, but the land was conveyed to them, by the mortgagees, and they on the 11th day of February, 1861, re-conveyed the farm land by deed of mortgage to a part of the original mortgagees whose debts thus secured amounted to $4553, which was not all paid until 1864 or 1865 ; the old man paying part of the money as agent of the boys. It was further shown, that William W. Henderson as the administrator of the estate of George Henderson, deceased, commenced a suit in the Clay Circuit Court, against James Henderson, Sr., on the 6th day of October, 1860, on the note for $6500, executed to George Henderson in his life-time, and dated June 1st, 1856; that on the 27th day of October, 1860, the defendant in said suit (James Henderson, Sr.,) appeared in the Clay Circuit Court, and obtained leave to file an answer in the case, thirty days before the next term of the court; that no answer was ever filed, but that afterwards on the 29th day of April, 1861, judgment was rendered, in the cause against defendant, for want of answer, for the sum of $9525 ; that afterwards an execution was issued on said judgment, and the land in controversy levied on as the property of James Henderson, Sr., and sold by the sheriff to plaintiffs who received the sheriff's deed therefor.

On the part of the defendants it was shown in substance, that in June, 1860, James Henderson, Sr., the father of the other defendants, went to one Thomas McCarty, an attorney, and represented to him that he was involved in debt and desired to pay his home creditors. McCarty advised him, to make a mortgage on his property to secure the home creditors. After this, all of the notes of the home creditors were placed in the hands of McCarty, to be secured by a mortgage. The mortgage was made on the 24th day of July, 1860, the old man having previously given McCarty the names of all of his home creditors. It seems that Samuel Hard-

wick, an attorney of Liberty, was at the time controlling the $6500, note of W. W. Henderson, upon which the judgment was afterwards obtained; that the creditors, secured by the mortgage, requested McCarty, about the first of January, 1861, to have the property named in the mortgage advertised and sold; that it was properly advertised and sold on the 29th day of January, 1861; that the sale was well attended; Mc-Carty thought the land ought to have brought fifteen dollars per acre; that no arrangement had been made, between the creditors and the young Hendersons, previous to the sale about their becoming the purchasers of the land or other property; that after the sale an arrangement was made with a part of the creditors provided for in the mortgage, to give the boys time, if they would execute a new mortgage on the same land to secure them; that on the eleventh day of February, 1861, the three boys made a new mortgage by which they conveyed the land to a portion of the creditors who were willing to give time; that the amount of debts thus secured by the second mortgage was $4553, which included the debt of five hundred dollars before secured to Morris by the old man, on the 24th of July, 1860; that all other debts secured by the original mortgage and not included in the new mortgage were paid at the time of the sale, and the witness stated, that they were paid out of money received for the personal property sold; that all of the notes secured in the original mortgage, had been preserved by McCarty, and that he then had them in order to show that the transaction was a fair one, if a controversy should arise. Witness McCarty, further stated, that he was requested to be present at the sale by old man Henderson, as well as some of the creditors; that he made out a sale bill of the property sold; that he could not say that he considered himself old man Henderson's attorney in that matter, that he was his attorney in the suit by William Henderson; that no arrangement was made with the boys previous to the sale to the effect that the creditors would take a second mortgage from them and continue to wait for their money; but that witness shortly after the sale

had a talk with the boys; they wanted to pay their father's home creditors, and an arrangement was then made with part of the creditors, to give the boys time, and to these creditors the boys gave their notes and a mortgage on the land purchased by them; that he did not represent old man Henderson at the sale strictly as an attorney, but was requested to attend the sale. One of the mortgagees, in whose name with others, the sale was made, was not present at the sale.

Other evidence was introduced to the effect that the boys owned eighty acres of land, in addition to the land purchased at the sale, and that they made money in raising and feeding hogs; that they sold some stock in 1861; that they received about $2500, for feeding stock in 1863, and over four thousand dollars in 1864, twelve hundred dollars of which was paid to the old man. James A. Henderson, one of the defendants, was examined as a witness and stated that Washington (his brother), was twenty-five years old, and that he and Samuel were over twenty-one years old; that he paid some of the notes named in the second mortgage; that Washington paid some, did not know that his father paid any of them; that the creditors agreed with him and his brothers, that if they would pay their debts against the old man they would give them time; that no effort was made to his knowledge, to prevent persons from bidding at the sale; that there was but one bid on the land; that the last of the notes had been paid since the war; that he and his brothers concluded on the morning of the sale to bid for the land; they wanted to pay their father's debts, but their father did not know of their intention to purchase the land. It appears that he did not recollect that he or his brothers had any money; they expected that if they became the purchasers of the land they could borrow the money to pay for it. They had no knowledge that they could buy it on credit, until after the sale; could not say whether he knew that his father was sued by W. W. Henderson or not. His father took from 60 to 80 mules to Kentucky; could not say how many. He traded largely in 1860, but did not trade in 1862. His father settled

on the farm in 1854. All of the deeds and mortgages referred to, were read in evidence on the trial by the respective parties.

The question presented for the consideration of this court is: Was the Platte Circuit Court authorized, under the evidence in this case, to find that the deed of mortgage, made by James Henderson, Sr., to Harsel and others, conveying the land in controversy with his personal property, and the sale of the property by virtue thereof to his three sons, was a contrivance on the part of the old man to get his property out of his own name and in the name of the boys, with a view to hinder and delay W. W. Henderson in the collection of his debt against the old man, and thus to avoid and set aside the deed to the sons? Fraud will not be presumed when all of the facts in the case consist as well with honesty and fair dealing as they do with an intention to defraud. (Dallam vs. Renshaw, 26 Mo., 533; Rumbolds vs. Parr, 51 Mo., 592.) And in order to defeat the title of a purchaser from one who conveys lands with a fraudulent intent, the vendee must have notice of such intent or participate in the fraud. (Chouteau vs. Sherman, 11 Mo., 585.) And it may further be said, that there is no doubt that old man Henderson, finding himself unable to pay all of his debts at once, had the lawful right to pay some of his creditors in preference to others; but in doing so the transaction must be honest. He could not do so with the view or intent to deprive creditors not preferred, of all chance to ever be paid, or with a view to hinder and delay them in the collection of their debts. Such a conveyance might necessarily operate to delay creditors not preferred. But if the intention or view with which the conveyance is contrived and made, is to defeat particular creditors, then it is fraudulent as to such creditors. (Drury vs. Cross, 7 Wall., 299; Tompkins vs. Wheeler, 16 Peters, 106; Sibly vs. Hood, 3 Mo., 290; Gales vs. Labaume, 19 Mo., 17; Cason vs. Murray, 15 Mo., 378.)

Courts of equity will, in order to ascertain whether fraud existed or not in a particular case, look into all of the circum-

stances surrounding the whole transaction, and if the transac-
tion, when so considered, is inconsistent with fairness or hon-
esty, it will be held to be fraudulent.   In the case under con-
sideration, we find old man Henderson in the month of June,
1860, purchasing mules in Clay County, Missouri, to be taken
to Kentucky for sale.   The evidence shows that at this time
he was considerably indebted, and that among others he was
indebted to W. W. Henderson as administrator of the estate
of George Henderson, deceased, in the sum of $6,500, with
interest for several years; that on the 17th day of June, 1860,
a letter was received from one Coleman, an attorney of St.
Louis, in whose hands the note of W. W. Henderson had
been placed for collection, requesting payment of the note.
This letter was answered by Washington Henderson, one of
the defendants, on the 18th of June, 1860, in which he ur-
gently requested that his father should not be compelled to
pay all of the note at once, or in his own words, that "we"
shall not be compelled to pay it all at once; he states in this
letter that his father was then in Kentucky, but would see to
the matter as soon as he returned.   There is other evidence
that shows that the old man was in Clay County and gave a
note for mules purchased on the 28th day of June, and that
he on that day started for Kentucky, ten days after this letter
was written.   The old man returned from Kentucky in July,
1860, and soon after his return he went to a lawyer for con-
sultation.   He then stated that he was embarrassed with debts
and wanted to pay his home creditors.   None of these cred-
itors were urging him to pay their demands.   He went to these
creditors, offered to give them a mortgage, telling one of
them that he might be sued for an unjust debt, and suggest-
ed to him that he should have his debt put in the mortgage.
It does not appear that any of the home creditors urged or
desired the mortgage, but that the old man was anxious to give
the mortgage and urged them to have their notes secured by
the mortgage.   The lawyer consulted had advised him to give
the mortgage.   The notes were all placed in the hands of this
attorney, and on the 24th day of July, 1860, the mort-

gage was executed conveying the land in controversy as well as a large amount of personal property, including horses, colts, oxen, cows and calves, hogs, wagons, harness, a stack of oats, fifty barrels of corn, and even his plow gear. It seems that a correspondence was going on between old man Henderson and Coleman, the attorney of W. W. Henderson about this time, in reference to the settlement of the debt in Coleman's hands, and that McCarty, the lawyer previously consulted by the old man in reference to the giving of the mortgage, was also engaged by him in this business with Coleman; and that on the 25th day of September, 1860, James Henderson, Sr., procured his attorney to write a letter to Coleman in answer to one from Coleman of the 17th, in which he informs him that the debt to William W. Henderson would not be settled on the terms proposed, and that he might take such course in the premises as his duty and the law required. A suit was at once commenced in the Clay Circuit Court by William W. Henderson against old man Henderson on the note for $6,500. In the latter part of October old man Henderson appeared in the Clay Circuit Court and obtained leave to file an answer in the action thirty days before the next term of the court, which was held in April, 1861.

No answer was ever filed, and judgment was rendered in the cause in April, 1861, for want of an answer. On the 29th day of January, 1861, a sale was made under the mortgage. At this sale, the three defendants, sons of old man Henderson, purchased the land at ten dollars per acre, and they also purchased a large portion of the personal property. The mortgagees not only sold all of the property named in the mortgage, but they sold some seven plows which were not named in or conveyed by the mortgage, which were purchased by the boys. The evidence shows that the land was worth fifteen dollars per acre, and some of the witnesses thought more; but the only bid for the land was ten dollars per acre, the creditors not bidding; some of them saying that they did not want land and that they considered their debts good. One of them stated in his evidence, that he had been assured by a

confidential friend that his debt would be paid. The debts purporting to be secured by the mortgage were over eleven thousand dollars. The property sold brought, in the aggregate $3,807 95-100. Of this amount the purchases of the boys amounted to $2,377 55-100; that purchased by others, 1,430 40-100. The boys paid no part of the money for the purchases made by them; but a few days afterwards gave a mortgage on the land purchased to a part of the same creditors in the original mortgage to secure their debts, which amounted to $4,553; and all other debts named in the original mortgage were paid at the time. It is said by one of the witnesses, that these debts were paid out of monies received for personal property sold; but it will be seen from the evidence, that all of the personal property sold to others besides the boys only amounted to a little over fourteen hundred dollars, while the debts paid at the time must have been over seven thousand dollars. It will thus be seen, that old man Henderson must have paid out, in payment of the debts named in the mortgage, over five thousand dollars at the time of the sale. Under this state of facts, what necessity was there for the sale of property under the mortgage? The debts secured by the mortgage being about eleven thousand dollars, between five and six thousand was paid at the sale, and must have been paid by the old man. About $1,400 was received for personal property, and the balance of the creditors were willing to wait for their money, and did wait, taking a mortgage on the same land from the boys. Why was it necessary under these circumstances, for the old man to sell his plows to his sons, which were not named in the mortgage, and his plow gear, wagons and harness, which were in the mortgage? Why was it necessary to sell the little corn in his crib, his oats and stack, and his cows and calves? To my mind it is clear, that on the old man's part, the main object in executing the mortgage by him of the 24th of July, and in procuring the sale thereunder, was to defeat the collection of the debt to William Henderson as administrator of his father's estate.

The only remaining question is, had the boys or any of

them notice of this fraudulent intention on the part of their father, or did they participate therein? Washington Henderson, the oldest of the boys and the one who answered the old man's letters in his absence, knew of the debt to William, the administrator, and urged the postponement of the collection; he purchased his father's property; he must have known that his father had money with which he paid the most of the debts secured by the mortgage, after the property was all sold under the mortgage. He was a purchaser at the sale of his father's plow-gear and his plows for a mere nominal sum. The old man still holds possession of the farm, while one of the boys has moved to Nebraska. The answers of the old man and the boys are not under oath. The circumstances of the case were sufficient to raise a very strong presumption of fraud against the boys, and of an intention to defeat the debt of William Henderson, the administrator. The facts of the case were within the knowledge of the old man and the boys, to show conclusively who it was that furnished the money to pay the debts secured by the last mortgage, and why it was that the sale under the mortgage, so far as the purchase by the boys was concerned, was entirely abandoned and all the debts of the old man paid at the time of the sale, except a little over four thousand dollars, which was secured by the mortgage given by the boys. The burden was thrown on them to show the fairness of the whole transaction, and yet only one of the boys was examined. At the trial the old man and the other two boys, and one of them the oldest, who it is shown attended to the old man's business in his absence, remain silent; are not examined at the trial, although there was nothing to prevent their examination, in which they could have explained the whole transaction and shown who it was who furnished the money that paid the debts and released the land, and what was done with the money received by the old man for nearly one hundred mules.

These things all being taken into consideration, although the evidence against the young men is not entirely clear, we cannot say that the Circuit Court did wrong in rendering a

decree in favor of the plaintiff. (Sands vs. Carduise, 4 Serg. & R., 558–9; Lay vs. Lawrence, 8 Dana, 80.)

The judgment is affirmed. The other judges concur.