————O————

BENJAMIN AMES, Respondent, *vs.* HUGH GILMORE, *et al*, Appellants.

1. *Equity, proceedings in—Title to land—Divestiture and investiture of, in same proceedings.*—Courts of equity may in the same proceeding divest title out of a fraudulent grantee, and, also, invest it in the plaintiff.

2. *Chancery—Relief, what may be granted.*—In chancery cases, courts may grant any relief which is consistent with the pleadings.

3. *Equity—Failure to dismiss as to certain parties, no ground for reversal, when.*—Failure of the lower court to enter a judgment of dismissal as to certain parties who do not complain, and under circumstances where no injury can result therefrom, will not authorize reversal of a decree in equity.

4. *Practice, civil—Supreme Court—Objection to joinder when too late.*—An objection for misjoinder of parties or causes of action, raised for the first time in the Supreme Court, comes too late.

5. *Equity—Bill to set aside deed on ground of fraud—Allegations as to consideration.*—In proceedings in equity to set aside a deed where the petition charges both fraud and failure of consideration, but the *gravamen* of the action is the fraudulent intent with which the deed is executed, evidence which proves that the consideration did not entirely fail, but was merely inadequate, is competent, as showing a circumstance to be taken with others in proof of fraud.

6. *Fraud not presumed, when.*—Fraud will never be presumed where all the facts consist as well with honesty and fair dealing.

7. *Fraudulent conveyance—Participation of grantee.*—In order to defeat the title of a purchaser from a fraudulent grantor, he must participate in the fraudulent intent.

8. *Conveyance by one in failing circumstances—Intent to hinder and delay creditors.*—One in failing circumstances may prefer one creditor to another, where he has no intention to thereby defeat, hinder or delay the remainder.

9. *Sales—gross inadequacy of price, taken with other circumstances conclusive of fraud, when.*—Gross inadequacy in the price paid for land is a badge of fraud which may be considered by the chancellor, and becomes of controlling force when coupled with other circumstances tending to prove fraud.

10. *Fraud—Evidence—Demeanor of witnesses.*—In determining questions of fraud, much must be left to the judgment of the court which has the witnesses before it.

### *Error to St. Louis Circuit Court.*

*J. W. Noble, and Shearman,* for Appellant, contended— among other points—that the court erred in its decree vesting the title of the land in plaintiff. Henderson vs. Dickey, (50 Mo., 257), did not overrule the principle adopted in Peyton vs. Rose, (41 Mo., 262), that the court cannot, in the suit to set aside a deed, go further and clothe plaintiff with the title. And Henderson vs. Dickey, unquestionably denies the chancellor such power unless the petition contain two counts calling separately for the two measures of relief. Again, that cause was based on a particular statute authorizing a writ of possession whenever a judgment is given for the conveyance of real property, which is not the case here.

*L. N. Shreve and G. W. Mitchell,* for Respondent.

VORIES, Judge, delivered the opinion of the court.

This action was brought to set aside certain deeds, in the petition named, on the ground that they had been executed for the fraudulent purpose of hindering and delaying the plaintiff in the collection of a debt due him from defendant Gilmore.

The substantial facts set out in the petition were: that the defendant Gilmore, in the month of December, 1869, was indebted to the plaintiff in the sum of $8,000; that suit was then pending in the St. Louis Circuit Court between Gilmore and the plaintiff for the adjustment of said indebtedness; that on the ninth day of June, 1871, plaintiff recovered against said Gilmore, in said action, a judgment for the sum of

$1,382.20, together with costs; that on the third day of January, 1870, said Gilmore conveyed a lot of ground in block 605, on Seventh street, in the city of St. Louis (which is described in the petition), with the improvements thereon, to Luther Babcock as trustee for Daniel G. Taylor, to secure the payment of $1,500 claimed to have been loaned by said Taylor to Gilmore, and which was payable with interest three years after date; that said conveyance was made by said Gilmore with the fraudulent intent of hindering and delaying plaintiff in the collection of his said debt; that the said Hugh Gilmore, with the same fraudulent intent, afterwards conveyed his interest in said before described real estate, together with four arpents of land situated on the Natural Bridge road, near the city of St. Louis (which is also described in the petition), and all of his property, to defendant, William Dawson, for the pretended sum of $2,000 said Dawson also assuming the payment of said sum of $1,500 to said Taylor; that in July, 1871, an execution was issued on the judgment so recovered against said Gilmore by plaintiff, as before stated, and that the said lands were levied on and sold under said execution in due course of law as the property of said Gilmore, and at the sale the plaintiff became the purchaser and received a sheriff's deed therefor; that at the time when the property was conveyed by Gilmore to Dawson, it was worth at least $12,000, which was well known to defendant Dawson; and that he well knew of the indebtedness of Gilmore to plaintiff, and combined with said Gilmore to cheat and defraud plaintiff, and hinder and delay him in the collection of his said debt; that said purchase of Dawson was fraudulent and without any consideration; that Gilmore was at the time wholly insolvent, and unable to pay his debts, unless said property so conveyed could be used for said purpose.

It is prayed by the petition that the conveyances so made between Gilmore and Dawson be declared void and of no effect and that the court by proper order vest the title to the real estate in plaintiff, and that the rights of the parties to said deed of trust be determined, and for further relief, etc.

The defendants answered separately, denying all fraud on the parts of each, or any knowledge of fraudulent intent in others, and Dawson claimed to have purchased in good faith and without fraud, etc.

. The issues were tried by the court and a judgment rendered in favor of the plaintiff, setting aside or vacating the deed from Gilmore to Dawson and vesting the land in plaintiff, and rendering judgment against Gilmore and Dawson for costs.

No disposition of the case, so far as Taylor and Babcock are concerned, is made in the judgment or decree, but so far as appears by the record the case is still pending against them.

The defendants, Dawson and Gilmore, filed a motion for a rehearing, setting forth all of the usual grounds therefor. This motion being overruled, the defendants excepted and appealed to the general term of said court, where the judgment rendered at special term was in all things affirmed, and the said defendants appealed to this court.

It appears from the record in this case that for some years previous to the 4th day of December, 1869, the plaintiff and defendant Gilmore were partners in the milling business; that at the time last aforesaid, Gilmore commenced a suit against plaintiff, the object of which was to dissolve and settle up said partnership, Gilmore charging in the petition that upon a settlement of the partnership the plaintiff would be found to be largely indebted to him, etc. The plaintiff, who was defendant in that suit, filed an answer in the nature of a cross-bill, in which he claimed that Gilmore was largely indebted to him on the partnership account, and asked judgment upon a final hearing for said indebtedness. This action was pending in the St. Louis Circuit Court at the time that defendant Gilmore made the conveyances complained of in the petition. On the 9th day of June, 1871, a judgment was rendered in said action in favor of plaintiff and against said defendant Gilmore for the sum of $1,382.20. It was upon this judgment that the execution issued, under which plaintiff purchased the land or lots in controversy.

There is no question raised in this case as to the regularity of the execution and sale by the Sheriff, or as to the sufficiency of the Sheriff's deed, made to plaintiff to convey the title to the land, provided Gilmore had any interest in the land at the time to be conveyed. The grounds which have been urged and insisted on in this court, upon which a reversal of the judgment is claimed, are:

1. That the court erred in rendering a decree vesting the title to the premisses in controversy in plaintiff, even if the deed from Gilmore to Dawson should be set aside.

2. That it was error in the Circuit Court to render a final decree in the case as between the plaintiff and defendants Gilmore and Dawson, without disposing of the case as to the other defendants.

3. That the evidence fails to support the facts as charged in the petition and is insufficient to authorize the decree rendered by the court.

The first ground of objection raised by the defendant, in reference to the form and extent of the decree, is not well taken. Courts of chancery may in such cases not only set aside or cancel a fraudulent deed, and thereby divest the title of a fraudulent grantee, but the decree may proceed to invest the title thus divested in the plaintiff. In most cases such a decree would be wholly unnecessary, for the reason that the cancelling of the deed made to the fraudulent grantee would of itself have the effect to vest the title in the plaintiff, the only obstacle in the way of his legal title having been removed. But in all chancery cases the court may give any relief which is consistent with the pleadings. (Henderson vs. Dickey, *et al.*, 50 Mo., 161.) And although the language of the opinion in the case of Peyton vs. Rose (41 Mo., 257), may seem to be inconsistent with the doctrine above stated, yet there is nothing in that opinion inconsistent with the decree in the present case, and therefore it is not necessary to further discuss the first point raised by defendant.

The second ground of objection raised by the defendant is of a technical character. There is no doubt but the court,

either before rendering a final decree in the case or at the time of making the decree against the defendants Gilmore and Dawson, should have disposed of the case as to the defendants Babcock and Taylor; but Babcock and Taylor are not complaining, and we cannot see how the defendants here are injured. There seems to be no evidence against Babcock and Taylor, and we can only suppose that the case was abandoned by the plaintiff as to them, and that the failure to enter a dismissal as to them was a mere oversight, which can do the other defendants no injury.

It is also contended that Taylor and Babcock were improperly joined with the other defendants in the action, and that the petition therefore improperly joined two causes of action in the same petition against different parties, and was, therefore, multifarious. Without expressing any opinion on this subject, it is sufficient to say that the failure to demur to the petition, or to plead the matter specially, waives all objections to the petition except as to the jurisdiction of the court, and that the petition does not state facts sufficient to constitute a cause of action. Such an objection, if otherwise well taken, comes too late when raised for the first time in this court.

Under the third and last point raised in this court by the defendant, it is argued that the evidence does not sustain the plaintiff's petition, in this : that the petition charges that the deed was executed to Dawson by Gilmore without consideration, while the evidence shows that there was some consideration for the deed, and only tends to show that the consideration was inadequate ; which it is contended cannot be done under the allegations of the petition. If this action had been brought to charge defendant Dawson as a trustee who was holding the lands in his name in trust for Gilmore, on the ground above stated, that the conveyance to Dawson from Gilmore was a voluntary deed executed without any consideration whatever, there might be some force in the position of the defendant. But that is not this case; the petition charges that the deed was executed to Dawson for the fraudulent purpose of hindering and delaying the plaintiff in collecting his debt.

It is true that the petition charges also that the deed was executed without consideration ; but the main *gravamen* of the action is the fraudulent intent with which the deed was made and received. It was certainly competent for the plaintiff, as a circumstance to be taken with the other facts tending to prove fraud, to prove the inadequacy of the consideration paid for the property.

The remaining question to be considered by this court is, was the evidence in the case sufficient to justify the court in finding, or to authorize the court to find, that the conveyance from Gilmore to Dawson was fraudulent, as charged in the petition, and to grant the decree rendered ? Fraud will not be presumed in any case where all of the facts detailed in evidence consist as well with honesty and fair dealing as they do with the intention to defraud. (Henderson vs. Henderson, et al., 55 Mo., 534 ; Rumbold vs. Parr, 51 Mo., 92 and cases cited.) And in order to defeat the title of a purchaser from one who conveys land with a fraudulent intent, the vendee must have some notice of such intent, or in some way participate in the fraud. (Ibid.) And it may be further said that a party in failing circumstances may, with an honest view to pay his debts, convey his property to any one of his creditors in payment of a just debt to such creditor. But in so doing he must have no fraudulent intent to defeat, hinder or delay other creditors in the collection of their debts.

The evidence in this case, which bears on the question of fraud, or upon the real issues in the case, is rather brief, consisting of only a few facts, although we have a record here containing about one hundred and fifty pages, a great portion of which consists of interrogatories to witnesses, which elicit no material fact, and conversations between the attorneys with each other and with the court, as the same seems to have been noted down by some short hand reporter at random, and without reference to its materiality. One William Vogt testified that in the spring and summer of the year 1870 he resided in the Gilmore house on Seventh street, (on one of the lots now in controversy); that he knew Gilmore shortly after

the dissolution of the partnership in the milling business between Gilmore and plaintiff; that shortly after the partnership was dissolved, Gilmore entered into another partnership for the purpose of manufacturing shoes, etc.; that the shoe shop was near Green street, and that the business was carried on there during the spring and summer of 1870. Witness stated that he was at the shop frequently, saw Gilmore's name on the sign at the shop; that sometime shortly after the business had commenced at this shop, he called there; saw that Gilmore's name had been *scratched* off from the sign; that he asked Gilmore what it meant, what was the object in erasing his name from the sign; that Gilmore answered, "well, I have got a law suit with the old man, and if I would lose, so that I would have to pay the costs myself, it would break me entirely." It is proper to say at this point that Gilmore and three other witnesses professing to be well acquainted with the facts, testify that Gilmore's name never was on any sign at the shoe shop, but that the sign always read "Krutzinger, Ferguson & Co.," and consequently Gilmore's name could not have been scratched off; and Gilmore denies the whole conversation. Vogt further testifies that after the conversation with Gilmore, above referred to, about the month of May, 1870, he had another conversation with Gilmore, in which he told Gilmore that he had seen from the papers that he had sold his house; and Gilmore answered that he had not sold it, that he had only given a deed of trust on it; denied that it was sold; said he had only got some money on it. Witness further testified that he had rented the Seventh street house of Gilmore shortly after the dissolution of the partnership between the plaintiff and Gilmore; that he had paid some rent in advance; that sometime afterwards an agent of Dawson, or one professing to be so, demanded rent of him; that he refused to pay it to Dawson, and was sued for the rent in Dawson's name in August, 1870; that he occupied the house until November, 1870, when he moved out and took the keys and offered them to Dawson; that Dawson refused to receive the keys, telling him that he would

have nothing to do with the house. In reference to this last statement of Vogt, as to this refusal of Dawson to receive the keys, etc., it is corroborated by others who were present, although denied by Dawson in his evidence.

William Ames, a son of plaintiff, testified that shortly after the commencement of the suit by Gilmore against his father, about the last of December, 1869, he had a conversation with Gilmore, in which he told Gilmore that he had taken the wrong course with his father (who was also the father-in-law of Gilmore, whose wife was dead); that in all probability the suit would go against him, and Gilmore replied, that "father should never make a dollar off of" him.

The plaintiff also testified that in a conversation between him and Gilmore about their law suit during its pendency, Gilmore declared that plaintiff should " never make one cent off of " him. Plaintiff also testified that the Seventh street lot in controversy was worth from three thousand to forty-five hundred dollars, and that he, the plaintiff, was in possession of the four arpent tract on the Natural Bridge road, and owned a life estate therein; that he was eighty years old, and that it was said that Gilmore's daughter claimed one-fourth of the remainder after plaintiff's life estate, and that Gilmore owned the balance of the remainder after plaintiff's death; but about the right of the daughter plaintiff did not know; that the four arpent track of land had an orchard and other improvements on it.

Rufus Baily testified that the Seventh street property had for the last three years been worth four thousand five hundred dollars; but that during that time property was dull; that it was hard to sell it for its worth.

One Bircher testified that he had known Ames and Dawson for twenty years; that he was well acquainted with the four arpent tract of land purchased by Dawson of Gilmore, on the Natural Bridge road; that at the time of the purchase by Dawson it was worth six thousand dollars cash; that he would not have given that amount for it on speculation; that his estimate of the value of the land presupposed that the

title was good ; that Dawson lived in the vicinity of the property, and was a man considered to be good and a man of means. It was also shown that Dawson was the step-father of Gilmore, and was raising Gilmore's child ; that Gilmore had married plaintiff's daughter, but that his said wife is now dead.

On the part of the defence it was shown by three witnesses that in the spring and summer of the year 1870 Gilmore was well known to be a partner in the firm of Krutzinger, Ferguson & Co., who were in the shoe business ; that Gilmore's name was never on the sign, but that he was publicly known to be a partner, until the firm failed in the fall of 1870.

T. Commisky testified that he had been a real estate agent for thirteen years ; made Dawson's acquaintance a short time before this suit commenced, about a year ; that Gilmore came to witness in the summer of 1870, told him that Dawson was sick and engaged witness for Dawson to collect rent from Vogt for the Seventh street property ; that witness commenced a suit to collect said rent ; that he knew the Seventh street lot, it was worth from three thousand to thirty-five hundred dollars at that time.

One John Lady testified that he followed loaning money on real estate ; that in the forepart of the year 1870, Hugh Gilmore came to witness to borrow money on four arpents of land on the Natural Bridge road, where Ames at the time resided ; that the property was examined by witness, and he concluded to loan Gilmore money on the land, but after getting the title papers examined witness refused to make the loan ; that the land was "nice" land, worth from four to five hundred dollars per acre, if the title was good.

Defendant Dawson testified that he resided near the four arpent tract of land in controversy and owned land in that neighborhood. As to the value of land there, his evidence is very indefinite, but he fixes the value at from four to six hundred dollars per acre ; the piece in controversy he estimates at four hundred dollars per acre ; but he testifies that he placed almost no estimate on it, as Ames was in possession and

he did not know who held the title, but that Gilmore claimed part of it, and that there were back taxes due on it, and he would not have a suit for it; that after Gilmore and Ames dissolved partnership about January, 1870, Gilmore came to witness; wanted to borrow money; said when he got a settlement with Ames, he could pay it back. Witness loaned him $800. In March following, he wanted to borrow more money; said he had not yet got a settlement with Ames. Witness refused to loan more money. Then Gilmore proposed to sell witness his house and lot with his right in the piece of property in the country. The witness then proceeds as follows: "As soon as he made a deed to the property, I gave him seven hundred dollars more, and on the first of April, after he came to me, I gave him a note, drawn on sight, and I think I paid him that note in May; the note was for five hundred dollars." The witness then stated that he did not know when he got the deed; that when he made the note for five hundred dollars, Gilmore gave him the deed. There was a fifteen hundred dollar deed of trust on the Seventh street property, which witness also agreed to pay. The witness also states that he got the keys to the house on Seventh street of Gilmore, when he bought the land, and afterwards he states that he got the keys of Vogt when he tendered them in November, 1870. On cross-examination, the witness after giving a very confused statement as to the manner and time of paying the money to Gilmore for the land, wound up by saying that he had given the note for five hundred dollars, and afterwards paid it before he paid the seven hundred dollars, and got the deed; that the seven hundred dollars was the last paid; he also stated in the cross-examination that he did not get the deed when he paid the seven hundred dollars. It does not appear that Mr. Commisky ever transacted any business for Dawson, except to bring suit against Vogt for rent, at the request of Gilmore. Gilmore in his testimony contradicted the evidence tending to show fraud; said that he thought he did well in selling the land; that he got five hundred dollars

more than he could get from others, but he fails to show or state any effort to sell to others except to mortgage to Lady who refused to loan money on the land.

Now the question is, was the court justified in finding the issues in the case for the plaintiff, and in vacating the deed to Dawson?

If the evidence of the witness Vogt is not wholly disregarded, there can be no question as to the sufficiency of the evidence to show fraud on the part of Gilmore; for when the evidence of Vogt is taken in connection with the other evidence in the case, and the fact that the property seems to have been sold to a step-father of Gilmore for an inadequate consideration, the court might well be justified in finding that Gilmore conveyed the property with intent to defraud plaintiff. The evidence shows that the lot on Seventh street was fully worth the whole consideration paid by Dawson for both pieces of property. The property was rented at the time for $35 per month, and the lowest price fixed on the Seventh street property by any witness was from $3,000 to $3,500, while other witnesses placed its value at $4,500, and the whole consideration assumed to have been paid for all the property by Dawson was $3,500. So that from the evidence no consideration was really received for the four arpents of land on the Natural Bridge road.

. It has already been said that if the evidence of the witness Vogt is to be credited, the court was sustained in its finding as to the defendant Gilmore. Vogt's evidence is contradicted pretty effectually in one material point; for it pretty clearly appears that Gilmore's name was never on the sign at the shoe shop. It follows that whatever Vogt said about Gilmore's name having been "scratched" from the sign, and the conversation related as growing out of that fact was either a mistake or a fabrication. If a fabrication, his evidence ought to be wholly rejected; but if he was mistaken about the name being erased, and only observed that Gilmore's name was omitted from the sign, and the conversation really took place, but grew out of that fact, his evidence would be but little

effected. The judge of the Circuit Court who tried the case and saw the demeanor of the witnesses, is a better judge of their credibility than we can possibly be.

As to the evidence to affect Dawson with the fraudulent intent, the affirmative evidence in the case is not very clear; and if we were trying the case here in the first instance, with the facts as they appear before us, we might or might not come to the same conclusion that was arrived at by the Circuit Court. The same evidence of the want of a sufficient consideration for the land purchased is to be taken into consideration when considering the case as to Dawson. It is a rule, in considering such cases, that, while a slight inadequacy of price alone is very weak evidence, if the inadequacy is gross it becomes a badge of fraud which may be considered by a chancellor, and becomes of controlling force when coupled with other circumstances tending to prove fraud. (Curd vs. Lackland, 49 Mo., 451). Now, in this case it appears that Dawson took no notice of this property for some time after the supposed purchase from Gilmore; it appears from his evidence, and that of Gilmore, that he sent Gilmore to employ an agent to collect the rent for the lot in the city. The agent employed was one that had never before or since been employed by Dawson. Dawson seems to have had no correspondence with this agent, employed others to look after the property after Vogt left it, and swears that he never has received a cent of rent for the property. He refused, before two witnesses, to take the keys of the house after Vogt left it, saying he would have nothing to do with the property. He is a step-father of Gilmore, and is raising one of his step-children; he seems to have but little concern about the property; never had the title to the lot on Seventh street examined, and claims that he considered that lot to have almost the entire value of the whole property purchased; and above all, when we consider the very confused, unreasonable and contradictory accounts given by him in reference to the manner, objects and time of the purchase, and payments made for the property, and the time that he received the keys for the

same, the most of which evidence is not necessary to repeat in this opinion—when all these things taken together are considered—we do not feel authorized to say that the court that had the witnesses before it and observed their consistency and demeanor, improperly decided the case in favor of the plaintiff. (Henderson vs. Henderson, 55 Mo., 534.)

The judgment will be affirmed. The other judges concur.