## THE STATE v. RODMAN, Appellant.

### Division Two, March 31, 1903.

1. **Change of Venue: MERE INACCURACY OF CLERK.** The mere inaccuracy of the clerk in certifying a transcript does not affect the jurisdiction of the court to which the cause is removed by change of venue.

2. ————: ————: **"PROCEEDINGS".** The proceedings of a court of record can only be known by its record, and if in making out his transcript in a change of venue the clerk makes a full transcript of the record and certifies that it is a "true, full and complete copy of the record," the fact that the certificate omits the statutory words "and proceedings," does not impair the jurisdiction of the court to which the cause is sent.

3. ————: ————: **POWER OF COURT OVER.** If the certificate of the clerk making the transcript in a change of venue is insufficient, it is entirely competent for the court to which the cause is sent to make a rule on such clerk to perfect his transcript by a proper certificate.

4. ————: **SPOLIATION OF INDICTMENT: PROOF: PAROL EVIDENCE.** Where the transcript of the indictment has been mutilated after it has been lodged in the court to which the cause is removed by change of venue, it is competent to prove such spoliation by the production of the original indictment, and to properly authenticate such original indictment, the clerk of the court in which it was found may be called to identify it. Such original indictment is the highest and best evidence of what were the contents of the indictment when it was presented by the grand jury; it is record evidence, not parol.

5. ————: ————: **POWER OF COURT.** The court has an inherent right to restore to its original state a mutilated indictment, which was presented by a grand jury of the proper county and to which defendant has pleaded, and defendant or the State has a right to demand such restoration.

6. ———: ———: ———: METHODS. The court can do this by certiorari on the clerk of the court in which the indictment was found, or it can make a rule on him to send up a perfect transcript, or the clerk, by leave of court, may make a new transcript, without any such rule or certiorari. But the same end is reached, if the original indictment is on hand, by ordering it to be filed and thereby correcting the despoiled transcript. And in such case it is not error to permit the original to be read to the trial jury.

7. Murder: INTERCESSION OF NEIGHBORS: NAMES. A witness for the State had testified that after the shooting of defendant by deceased about one year prior to the fatal encounter, a committee of neighbors waited on deceased in regard to the difficulty, and defendant's counsel on cross-examination inquired the names of this committee and this inquiry the court excluded. Held, not error, since the purpose of the inquiry was not disclosed, and the action of the committee could not have affected the duty or obligation defendant or deceased owed each other.

8. ———: REPETITION OF EVIDENCE. Where a witness has distinctly stated when he communicated to the defendant certain threats made by deceased, it is not error to refuse to permit him to repeat his answer.

9. ———: ENGAGEMENT OF DECEASED'S DAUGHTER. It was not erroneous to exclude what a daughter of deceased had said in regard to her engagement to defendant, nor how she deported herself in his presence.

10. ———: REMARKS OF THE PROSECUTING ATTORNEY. Irrelevant remarks of the prosecuting attorney concerning what every intelligent man knows to be the law, without making any application of them, is no ground for reversal.

11. ———: FACTS IN EVIDENCE. Extreme bitterness, originating in defendant's persistent attentions to the daughter of deceased, had existed between them for a long time, which resulted a year previously in deceased shooting defendant, for which he was not indicted, and this bitterness was manifested also in a violent hate by deceased for defendant. The evidence for the State tended to show that while deceased was at work in his field defendant concealed himself behind a hedge near the route he knew deceased would take in returning from his labors when his day's work was ended and as he approached, riding on his mule, defendant from his hiding place fired his pistol at him but missed him. Thereupon deceased slid down off of the mule, and while his back was turned and he was forty yards distant, with an ax in his hand, defendant again shot and continued to do so until he had inflicted a mortal wound, without any assault or lawful provocation by deceased. Held, that grievous as were the previous provocations and assaults by deceased, they did not justify defendant in lying in wait for him and killing him, and these facts all being in evidence, the verdict cannot be disturbed.

Appeal from Randolph Circuit Court.—*Hon. John A. Hockaday,* Judge.

AFFIRMED.

*I. W. Boulware* and *D. P. Bailey* for appellant.

(1) The pretended transcript from the circuit court of Callaway county was not properly or legally certified by the clerk of that court. The certificate of said clerk did not state that the transcript contained "a full transcript of the record and proceeding in the cause." R. S. 1899, sec. 2586. (2) Nothing outside of a properly and legally certified transcript of the record in reference to the acts of the Callaway county court in the case could be or was known to the court. It was from this record that the Randolph court could obtain jurisdiction. No fact in this regard could be supplied by parol testimony. And when the transcript was withdrawn, there was nothing before the court to show that defendant was indicted by a grand jury of Callaway county, and if so that the case had been transferred to Randolph county. The whole record, and nothing but the record, must show these facts. 20 Am. and Eng. Ency. Law, pp. 475-6-7; State v. Ruby, 7 Mo. 206. (3) Upon a mere suggestion to the court that the transcript of the record had been altered, changed or mutilated, or that the clerk's certificate thereto was insufficient, it was the duty of the court to have made an order on the clerk of the Callaway Circuit Court to perfect the transcript and properly certify to same. This the court failed and refused to do. State v. Haws, 98 Mo. 193; Laporte v. State, 6 Mo. 298; State v. Bell, 126 Mo. 120; Henderson v. Henderson, 55 Mo. 534. (4) The evidence was wholly insufficient to convict the defendant of the crime charged. (5) The methods of the prosecution were illegal, unfair and calculated to bias and prejudice the minds of the jury against the defendant in this case.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1)    The certificate of the clerk attached to the transcript in this case recites ''that the above and foregoing is a full, true and complete transcript in the above entitled cause as fully as the same remains of record in my office.'' The certificate contains more than the statute requires, but it will certainly not be contended that the use of the words true and complete can in any manner invalidate it. The transcript from the Callaway Circuit Court was not withdrawn. The prosecuting attorney stated to the court, before the introduction of any evidence, that the transcript had been mutilated by the erasure of the words ''of which'' near the close of the indictment, and asked permission to substitute and read the original indictment in lieu of the copy contained in the transcript. The court permitted the clerk of the Callaway Circuit Court to identify the original indictment, and the prosecuting attorney read the same to the jury. This did not constitute error. 20 Am. and Eng. Ency. Law, p. 504; Stevison v. Earnest, 80 Ill. 513; Gray v. Davis, 27 Conn. 447; Williams v. Gorger, 125 U. S. 397; Day v. Moore, 13 Gray (Mass.) 522; Britton v. State, 54 Ind. 541; Folsom v. Cressy, 73 Me. 270; People v. Gray, 25 Wend. (N. Y.) 465; Miller v. Hale, 26 Pa. St. 432. The record could have been perfected by certiorari, but, as was said by this court in a somewhat similar case, ''the mode adopted by the court seems to be equally efficient and it does not appear that the defendant is likely to be in a worse situation for that.'' Laporte v. State, 6 Mo. 208. By leave of court the clerk could have perfected the transcript without a rule, and the action of the court in this case was tantamount to leave to perfect. State v. Haws, 8 Mo. 194; State v. Bell, 136 Mo. 120. No error was committed in permitting the original indictment to be substituted for the mutilated copy contained

in the transcript.  It was identified and proved by its proper custodian, the clerk of the Callaway Circuit Court.  The filing of the transcript from Callaway Circuit Court vested the Randolph Circuit Court with jurisdiction of the cause of which it was never afterwards divested.   (2)  The remarks of the prosecuting attorney may have been improper, but they were not of such character as to call for a reversal of the judgment.  They were not calculated to prejudice the jury against the defendant.  State v. Adler, 146 Mo. 18; State v. McNamara, 100 Mo. 100.

GANTT, P. J.—The defendant, Mayo Rodman, was indicted at the December term, 1900, of the circuit court of Callaway county, for murder in the first degree, of Charles Davis, in Callaway county, on October 25, 1900.   He was duly arraigned and pleaded not guilty in the Callaway court.

Afterward, in February, 1901, he made application in vacation to Judge Hockaday, the judge of that circuit court, for a change of venue from said county, on account of the prejudice of the inhabitants of Callaway county against him, and this application was sustained, and the change awarded to Randolph county in the same circuit and the clerk was directed to transmit a complete transcript of the record to the clerk of the Randolph Circuit Court, which was done, and the transcript was filed in the latter court February 11, 1901.   The cause was continued at the March term of the Randolph court, and was tried at the September term, 1901, and resulted in a verdict of guilty of murder in the second degree, and his punishment assessed at twenty-five years' imprisonment in the penitentiary. After motions for new trial and in arrest were filed and overruled, the defendant was sentenced in that court.

The homicide out of which this prosecution grew occurred on October 25, 1900.   The defendant, Rodman, and Charles Davis, the deceased, resided on adjoining

farms in Callaway county, near the town of Auxvasse. The defendant lived with his widowed mother and sister and was a bachelor. He was a farmer, and some ten years before had been a school teacher. Davis, the deceased, was a married man. His family consisted of his wife and five children, among whom was a daughter, Minnie Davis, a girl about seventeen years of age at the time of the homicide. The defendant became enamoured of this young lady, and began to pay her marked attention. He was finally ordered by deceased to cease his attention to the girl, as it was distasteful to her parents, but he continued to meet her on the road to school and wherever he could when she was away from her home until it finally culminated in a difficulty in 1899, about a year before this homicide, in which deceased shot and wounded defendant.

The matter was taken before the grand jury and deceased was discharged. From that time on a very bitter feeling existed between the deceased and defendant. Threats were indulged in by both sides. Some weeks before the killing of deceased defendant procured a new Smith & Wesson revolver and said on different occasions that if deceased ever assaulted him or crossed his path he intended to kill him.

On the afternoon of October 25, 1900, deceased was engaged on his farm, working at his corn pens, stretching wire around them, and his son, Nelson Davis, seventeen years old, was plowing in the field adjoining the pens, about a quarter of a mile distant. The deceased had one mule that he was using to pull the wire up to the pens. The son could see his father at work. About sundown the boy quit plowing a little before his father did. He saw his father stop work and start home, and the boy also started to the barn with his team. When within fifteen or twenty feet of a gate through which he had to go to reach the stables, the son heard a shot fired. He looked toward his father and saw him jump or slide off of his mule and the mule

ran away.   He testified that the first shot did not strike his father, but immediately a second shot was fired, which caused his father to drop on his face.   Four shots were fired in rapid succession.   He saw Rodman, the defendant, standing behind the partition hedge fence firing at his father.   When the first shot was fired, he heard defendant say, ''Now, by G—d, your time has come.''   He was then about one hundred yards from his father, and ran to him.   The deceased fell about twenty-seven steps from the hedge fence.   Defendant was about forty yards distant from deceased when he shot him.   The hedge at the point from which defendant shot was thick and well calculated to conceal him from deceased.

As defendant shot the last shot, he called to the son, Nelson, and said, ''I dare you to come up here.''  When the first shot was fired, Mrs. Davis heard it and ran out and ran to her husband.   According to the State's evidence the deceased had his back to defendant when the latter shot him.   On the part of defendant he testified that deceased was approaching him with an uplifted ax in his hand, and his other hand at his pistol pocket and cursing, abusing and threatening him, and remembering the former difficulty between them he shot him in self-defense.

On the part of the State, William Black testified he was at the home of Rodman the next morning after the shooting and defendant was in charge of the sheriff who permitted the defendant to go to the barn.   Black walked with him and said to him, ''Mayo, how did it happen?''   ''Where did it occur?'' · Defendant answered: ''East of the dead tree.   I was there and Davis was there on his side of the fence and he came running along there with his ax drawn and I pulled my pistol and shot three times in succession.''   He said, ''Davis aimed to turn, and he shot three times.   He said ''the second shot did it.''

Other witnesses stepped off the ground and testified it was twenty-seven steps from where deceased fell to the point behind the hedge from which defendant shot. There was also evidence tending to show that deceased was on his mule when defendant first shot at him, as the ball struck the gable of a chicken house and ranged upwards into the shingles, the house being in a direct line from the point at which defendant shot and where deceased fell.

Mrs. Davis, the wife of deceased, testified that when she reached her husband he was dead and she straightened out his limbs and put a shawl over him. In turning him she found he was lying on an ax, and she pulled it out and threw it aside. The testimony further showed he had sent to the house for the ax to use it in his work about the corn pens that afternoon. The evidence on part of defendant further tended to prove several other assaults by deceased on defendant between the shooting in October, 1899, and the fatal encounter on October 25, 1900.

The court fully instructed the jury on murder in the first and second degrees, manslaughter in the fourth degree and self-defense, and on all other propositions of law arising in the case which were necessary. Indeed, no objections are urged in this court to the instructions given by the court of its own motion, and none asked by defendant were refused.

The facts upon which a reversal is sought will be noted in connection with the several assignments of error.

I. The main insistence of the defendant is that the circuit court of Randolph county had no jurisdiction to try this case, first, because the transcript from the Callaway court was not properly or legally certified by the clerk of that court.

Section 2586, Revised Statutes 1899, provides that, "Whenever any order shall be made for the removal of any cause, under the foregoing provisions, the clerk

of the court in which the same is pending shall make out a full transcript of the record and proceedings in the cause, including the order of removal, the petition therefor, if any, and the recognizance of the defendant and of all witnesses, and shall transmit the same, duly certified under the seal of the court, to the clerk of the court to which the removal is ordered.''

The certificate of the clerk of the circuit court of Callaway county to the transcript sent to the Randolph court is as follows:

''State of Missouri, County of Callaway, ss.

''I, A. M. Jameson, clerk of the circuit court within and for the county and State aforesaid, do hereby certify that the above and foregoing is a full, true and complete transcript in the above entitled cause as full as the same remains of record in my office.

''Witness my hand and official seal.    Done at office in the city of Fulton, county and State aforesaid, this February 7, 1901.

''(Seal.)                 A. M. Jameson, clerk.''

The transcript itself contained the opening order of the circuit court of Callaway county on December 10, 1900, showing the presence of the judge of said court, Hon. John A. Hockaday,. the prosecuting attorney, sheriff and clerk; the administration of the oath to the sheriff and his deputies in regard to summoning jurors; the impaneling of the grand jury; and then on the 13th day of December, 1900, the return into court of an indictment against Mayo Rodman for murder, and of the delivery of a copy thereof to the defendant's counsel, and then follows a copy of the indictment itself; that afterwards on the 15th of December, 1900, the defendant was duly arraigned and entered his plea of not guilty, and the continuance of the case till the next term of the court.    The transcript then contains a copy of the petition for a change of venue in vacation

Vol 173 mo—44

before the next term and the order of removal granting a change of venue to Randolph county.

The certificate is a substantial compliance with the statute. The statute requires a *full* transcript, but the clerk in addition certifies and properly that it is a *true* and *complete* transcript. It would seem that the omission of the words "and proceedings" is the basis of the contention, but as the proceedings in a court of record can only be known by its record, and as the clerk certified a full and complete copy of the record, he certified everything that he was authorized to do and that was sufficient.

But if there had been an insufficient certificate it would by no means have followed that the circuit court of Randolph county had no jurisdiction of the case. On the contrary, it would have been entirely competent for the circuit court of Randolph county to have made a rule on the clerk of the Callaway court to have perfected his transcript by a proper certificate. The power and the right to so order necessarily admits jurisdiction in the court making such order. Nothing is better settled than this. [State v. Bell, 136 Mo. 120; State v. Haws, 98 Mo. 193, 194; Henderson v. Henderson, 55 Mo. 534; Laporte v. The State, 6 Mo. 208.]

The mere inaccuracy of the clerk in certifying a transcript does not affect the jurisdiction of the court to which the cause is ordered removed. It is the order of removal that divests the court making it of its jurisdiction. [Railroad v. Railroad, 118 Mo. loc. cit. 619.] Nor is this principle inconsistent with the rule that during the term and before the change of venue is certified, the court may set aside its order. [State v. Noland, 111 Mo. 488; State v. Daniels, 66 Mo. 192.] We must therefore hold that the circuit court of Randolph county was fully possessed of jurisdiction to hear and determine the case.

II. The next proposition urged by defendant is that the circuit court had no power to permit the trans-

cript to be amended by parol evidence. To a correct
understanding of this point we must have recourse to
the record to see what was in fact done. The record
recites that before any evidence was heard and before
the indictment was read, the prosecuting attorney
stated to the court that he had just discovered that the
copy of the indictment in the transcript had been ef-
faced and mutilated by the erasure of the words "of
which" near the close of the indictment by some one
unknown to him, and to make good his assertion he
exhibited to the court the transcript which disclosed
that a line had been drawn horizontally through the
words "of which" just before the words "mortal
wound" in the closing words of the charging part of
the indictment, and he thereupon asked leave to prove
the erasure and to show that no such spoliation was in
the original indictment or in the copy thereof in the
transcript when it was certified to the Randolph court.
To which defendant objected, that it was immaterial,
irrelevant and incompetent and no way to prove the
records of another court, which objection was overruled
and defendant excepted. Thereupon A. M. Jameson,
the clerk of the circuit court of Callaway county, was
called and sworn and testified that he was the clerk of
the circuit court of Callaway county. Thereupon the
original indictment preferred by the grand jury of Cal-
loway county was handed to him and identified by him
as the original indictment preferred by the grand jury
of Callaway county at the December term, 1900, of said
court against the defendant in this case and that it was
filed December 13, 1900. Upon an inspection of the
original indictment it was apparent that the erasure
had been attempted after the transcript was certified
and the trial court so found, and then and there per-
mitted and ordered the original to be filed and read
as the true indictment in the case. Pursuant to the au-
thority vested in this court by section 817, Revised
Statutes 1899, this court by its rule on the clerk of the

Randolph Circuit Court directed him to transmit to this court said original indictment for our own inspection and from such inspection it is plain that the spoliation occurred after the filing of the transcript in Randolph county. To this action of the court in thus correcting the record, the defendant objected because the paper identified by the clerk was a record of the Callaway court and has nothing to do with this court.

In their brief the learned counsel for defendant state the transcript was withdrawn and the original indictment substituted. This is a misapprehension. Nowhere in the record was there any offer to withdraw the transcript nor was it allowed. To properly dispose of the contentions by defendant, we proceed to examine them in their order.

First. It is insisted that it was not competent to prove the spoliation of the transcript by parol evidence. This is a mistake of fact. What the court permitted the prosecuting attorney to do was to produce the original indictment of the Callaway court in the hands of the lawful custodian thereof, to-wit, the circuit clerk of that county; having proved he was such clerk the State had him identify the original indictment, which on its face disclosed that there was no line through the words "of which." This original record was the highest and best evidence of what that indictment was when preferred by the grand jury. It was record evidence, not parol evidence. While the proceedings of a court are provable only by its record, or by an authorized copy properly authenticated, it was very correctly observed in State ex rel. v. Maloney, 113 Mo. 371, that "this general rule carries with it the corollary that verbal testimony may sometimes be requisite to identify as the record a particular document." [Walter v. Belding, 24 Vt. 658.]

This was all Mr. Jameson was called to do. He identified the paper offered in court as the original indictment, a record of the court of which he was the clerk

and the lawful custodian of its records. The proposition that it was not competent to prove the contents of the indictment by the original itself, because it was a file of the Callaway court, is utterly untenable. Nowhere is the true doctrine more clearly enunciated than by Mr. Justice SCHOLFIELD, in Stevison v. Earnest, 80 Ill. 513, in which he says:

"It is said, in books treating on evidence, that 'the record itself is produced only when the cause is in the same court, whose record it is; or, when it is the subject of proceedings in a higher court.' But this has reference to the ability of the court to compel the production of the record, and not to the question of its sufficiency as an instrument of evidence, if actually produced. The copy is receivable in evidence, not because it is better evidence than the original, but because it is presumed the original can not be obtained. . . . It does not, logically, follow, however, that the records being obtained can not be used as instruments of evidence, for the mere fact of obtaining them does not change that which is written in them. Whether they are where they ought to be, or elsewhere, they are records of the court. . . . What end of justice can be subserved when the records of one court are actually present in another court, by refusing to receive them in evidence and requiring them to be returned to their proper custody, there to be copied, and then receiving the copy in evidence? The facts proved must be precisely the same, whether the originals or copies are read in evidence, and it must, therefore, be totally unimportant to the party against whom the evidence is offered, which it shall be."

The doctrine is well-nigh universal. [Gray v. Davis, 27 Conn. 447; Williams v. Conger, 125 U. S. 397; Day v. Moore, 13 Gray (Mass.) 522; Britton v. The State ex rel., 54 Ind. 541; Folsom v. Cressey, 73 Maine 270; Miller v. Hale, 26 Pa. St. 432; People v. Gray, 25 Wend. 465.]

The circuit court of Randolph county had indisputable evidence that some one, either intentionally or by inadvertence, had drawn a line through two words of the indictment as copied into the certified transcript. It had the original before it and it had full jurisdiction to purge its records of anything which had been unlawfully placed upon them. No doubt whatever exists that it could have delayed this highly important public prosecution and issued its writ of certiorari to the clerk of the Callaway court to certify anew the indictment found by the grand jury, or it could have made a rule on him to perfect the transcript, and for that purpose transmitted the record to him, or the clerk, by leave of the court, doubtless could have corrected the transcript by a new copy without either a rule or certiorari, but the mode adopted by the circuit court was equally efficient. His action was tantamount to a finding that the line drawn through the two words "of which" was an unauthorized spoliation of a record of his court, and he ordered the true indictment filed to correct his record, and while this may have been somewhat irregular and unusual, it could not possibly result in injury to the prisoner. It was this original indictment on which defendant had been arraigned, and to it, not the spurious copy, he had pleaded not guilty. It was his constitutional right to be tried on that charge without change or variance.

The issue was made up on that paper, and what possible benefit could have accrued to him to have sent the clerk back to Callaway to make a new copy of it?

When the court ascertained, as it necessarily did, that some one had trifled with its records, it was its unquestionable and inherent right and duty to restore the same to their original state. In this case, in view of the unimpeachable and conclusive nature of the evidence, the court could have properly directed its clerk by an order of record to that effect to erase the unauthorized line, but it arrived at the same practical result.

by the method adopted, and in so doing committed no reversible error.

III.   We come now to the other assignments of error.   L. W. Bratton had testified that after the shooting of defendant and prior to the fatal encounter, a committee of neighbors waited on deceased in regard to the difficulty between deceased and defendant.   In the course of the cross-examination counsel for defendant inquired the names of the committee, and on objection the court excluded the answer, and defendant excepted.   This was not error.   The action of the neighbors, while highly commendable and praiseworthy, did not affect the duty or obligations that deceased owed to defendant, or vice versa.   It was entirely immaterial who constituted the committee, and the purpose of the inquiry was never disclosed to the trial court, and is not apparent to us.

It is further alleged that error was committed in not permitting William Rodman, brother of defendant, to testify when he communicated to defendant certain threats made by deceased against defendant.   As the witness had already testified that immediately after the deceased had made the statements to him he told defendant, it would and could only have been a repetition of the same answer, and we doubt not that it was excluded on that ground alone, as otherwise it would have been competent and material.   Having once answered the question, it was not error to decline to hear it again.

Exception was also saved to the action of the court in refusing to permit Jeff Hume to testify to certain threats by deceased in the presence of the witness.   The record discloses that when the defendant's counsel framed the question so as to indicate the time and place when the alleged threats were made, the court overruled the objection and directed this witness to answer, and defendant's counsel said, "I will excuse him from answering it."   Obviously there is no merit whatever in this contention.   It is hardly necessary to add it was

not erroneous to exclude what Minnie Davis had said in regard to her engagement to defendant or how she deported herself in his presence. They threw no light on the issue on trial.

IV. Error is predicated on the remark of the prosecuting attorney. It appears that the prosecuting attorney, for some reason not disclosed, because we are not favored with the connection in which he used the words, said: "Gentlemen of the jury, when a crime has been charged to have been committed, the defendant has the right to a preliminary examination before a justice of the peace. If the justice makes a mistake, the mistake may be corrected by the grand jury, and if the grand jury makes a mistake, then it may be corrected on trial in the circuit court, and if the circuit court makes a mistake, then it may be corrected by the Supreme Court, and if that court makes a mistake the Governor may pardon," at this point and before any application of this statement had been made, defendant's counsel objected, and the court sustained the objection and directed counsel to proceed, and keep in the record, and thereupon that line of argument was abandoned. No complaint was made that the rebuke was not severe enough if it merited any. But it is obvious that while it had no relevancy to the issue, the counsel made no misstatement of the law, and we are wholly in the dark as to what use he intended to make of it, when he was stopped. It is too plain for serious consideration that this statement of what every intelligent citizen in the State knows to be the law, without making any application of it, is no ground to reverse a judgment.

V. Finally, it is insisted the judgment is against the law and the evidence. No objection is made to the instructions and we discover none after a careful examination. Indeed we may say that more liberal and favorable instructions have never been given a defendant within our experience.

The evidence discloses a case of extreme bitterness

on both sides, which had resulted in the deceased shooting the defendant about one year previous to the shooting of deceased by defendant. The cause of this ill feeling is not left in doubt.. It originated in the attentions of defendant to the young daughter of deceased and his persistency after being forbidden to see her. That deceased manifested and expressed a deep feeling of hatred toward defendant, growing out of his relations with Miss Minnie Davis, is apparent, but granting and conceding all this, the evidence tended strongly to show that defendant, armed with a deadly revolver, on the evening of the homicide, secreted himself behind the hedge fence which formed the partition between the farm of Mrs. Rodman and deceased, and near the route which deceased would naturally take when he quit work and returned to his house that evening, and that as deceased was riding to his house on his mule the defendant from his hiding place shot at deceased, and missed him the first time, and that deceased having jumped from his mule and with his back to defendant was shot by defendant without having made any assault or given defendant any just or lawful provocation at the time. We say the evidence, if believed by the jury, would have sustained such a finding and it was their province to believe or disbelieve this evidence. If they did, it amply justifies a conviction of murder. Grievous as were the previous provocations and assaults by deceased on defendant, they did not authorize defendant to lie in wait and take the life of deceased and thus avenge his wrongs.

In the absence of some act on the part of deceased that evening showing a determination to renew the difficulty with defendant, the law will not justify his gratification of his revenge for the past indignities and assaults put on him by deceased.

On the other hand, if the jury had found and credited the evidence of defendant that deceased without provocation assaulted him with an ax and was close

enough to have hit him with it by throwing it at him, and knowing of the threats of deceased and remembering the previous difficulties, the defendant had cause to believe defendant was about to kill him or inflict great bodily harm on him and so believing shot and killed deceased, he was justified in so doing on the ground of self-defense. The court so instructed the jury. They believed the evidence for the State and rejected defendant's account of the tragedy. The case was fairly and impartially presented to the jury; the law was correctly laid down and there is no ground for ascribing passion or prejudice to the jury in reaching their conclusion.

After a careful review of all the evidence and the law as declared by the court, we are unable to find any error which would justify us in reversing the judgment, and it is accordingly affirmed.

*Burgess* and *Fox, JJ.,* concur.